J. WILLIAM HOLLAND, Trustee in Bankruptcy for the Estate of American Reserve Corporation, Plaintiff-Appellant, v. ARTHUR ANDERSEN & COMPANY, Defendant-Appellee.

First District (4th Division)   No. 83—1975

Opinion filed September 27, 1984.

Ross & Hardies, of Chicago (William P. O'Keefe, Jr., William H. Luking, Jeffery M. Cross, and Gregory L. Dose, of counsel, for appellant.

Charles W. Boand, Robert F. Forrer, and Quinton F. Seamons, all of Wilson & McIlvaine, of Chicago, for appellee.

JUSTICE JIGANTI delivered the opinion of the court:

This action was brought by J. William Holland, trustee in bankruptcy for the estate of American Reserve Corporation (ARC) against Arthur Andersen and Company (Andersen), one of ARC's independent public accountants, to recover damages on six counts of either misrepresentation or breach of contract in regard to auditing services provided by Andersen for ARC. Andersen filed a motion to dismiss all six counts of the complaint pursuant to section 2—615 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—615), alleging that the trustee could not bring this action because the trustee can assert only those causes of action held by the debtor, ARC, and that the instant causes of action belonged to ARC's shareholders and creditors, not ARC. Andersen further argued that even if these

causes of action were held by ARC that ARC was bound by the knowledge, acts and omissions of its officers and directors and that such knowledge, acts and omissions precluded recovery by the trustee against Andersen. Andersen also contended that ARC failed to allege sufficient facts to constitute claims for misrepresentation and that the complaint failed to state a cause of action in contract.

After memoranda were submitted and a brief hearing on the motion was heard, the trial court entered an order striking each and every count of ARC's complaint, denying ARC's leave to file an amended complaint and dismissing the causes of action against Andersen with prejudice. ARC now appeals.

All facts presented in the following statement of facts were extracted from a detailed complaint and attached exhibits filed by ARC. ARC is an insurance holding company incorporated in Delaware, with its principal place of business in Chicago. Several of its principal, wholly owned subsidiaries were Reserve Insurance Company (Reserve), Market Insurance Company (Market), American Reserve Insurance Company (ARIC), and Guaranty Reinsurance Company (GRC). These subsidiaries primarily engaged in property and casualty insurance involving high-risk coverage. ARC's financial demise began when court orders were issued in May and July 1979, placing Reserve and ARIC into liquidation and Market into rehabilitation. Subsequently, on April 21, 1980, ARC filed a voluntary bankruptcy petition for reorganization under chapter 11 of the Bankruptcy Code. In November 1981, ARC's bankruptcy was converted from a chapter 11 reorganization to chapter 7 liquidation proceeding. J. William Holland was appointed by the court as permanent trustee in bankruptcy for ARC on December 31, 1981.

The two relevant factual settings that are the focal points for the instant action involve the reissuance in 1977 of Andersen's unqualified opinion for ARC's 1975 consolidated financial statement and a reinsurance treaty entered into in 1974 by Reserve with an alien reinsurance company. ARC and Andersen developed their business relationship as a result of Andersen's being retained by ARC to audit its consolidated financial statements for the years ending December 31, 1958, through 1975. In each of those years, Andersen issued an unqualified opinion with respect to those consolidated financial statements. However, due to the highly speculative nature of its insurance business, the stated level of ARC's loss reserves proved to be the most significant and controversial calculation of the consolidated financial statement. Based on the exhibits attached to ARC's complaint, it appears that historically ARC and Andersen had a difference

in philosophy with respect to evaluating the adequacy of loss reserves. ARC displayed a constant optimism in their evaluation by assuming a reversal of unfavorable trends, which resulted in consistently low estimates, while Andersen projected a need for a more conservative approach in order to guarantee a higher and more adequate loss reserve figure.

In late 1975, ARC, in concert with a casualty actuary, determined the level of loss reserves to be carried on the 1975 consolidated financial statement and prepared working papers for Andersen to use during its audit examination. In early 1976, Andersen, after reviewing the determinations made by ARC, questioned various assumptions made by ARC with respect to the level of loss reserves, which were not supported by ARC's historical experience. Andersen indicated that based, on ARC's significant reserve deficiencies in the past, several of Andersen's computations showed ARC insolvent for the year-end 1975. However, after a series of discussions between ARC and Andersen, in which ARC was apparently able to persuade Andersen that ARC's loss reserves were adequate, Andersen rendered an unqualified audit report on ARC's 1975 consolidated financial statement on March 29, 1976.

Shortly thereafter, on April 8, 1976, ARC informed Andersen that ARC's board of directors had determined to change auditors. ARC explained to Andersen that it decided to engage Coopers & Lybrand in order to create greater efficiency, because Coopers already audited two companies acquired by ARC, and that it was easier to consolidate ARC's and its subsidiaries' auditing work with a single auditing firm. After some discussion between ARC and Andersen regarding the appropriate explanatory language to use a Form 8—K, a form required by the SEC when a firm changes auditors, the parties reached a mutual understanding, and the form was submitted containing the agreed-upon language.

In March 1977, Coopers & Lybrand audited ARC's 1976 consolidated financial statement and thereafter issued an unqualified opinion. Coopers then informed Andersen that Coopers' audit examination disclosed that during 1976 ARC had reduced its consolidated earnings by charging its income approximately $25 million for claim and claim adjustment expenses in excess of the loss reserves provided as of December 31, 1975, for claims incurred in 1975 and prior years. Coopers treated such charge as resulting from a change in estimate in 1976, but further informed Andersen that it would not state in its comfort letter that the charge was not a prior period adjustment. Coopers indicated that it based its determination that the deficiency represented

a change in estimate only on what it saw developed in 1976 and that Andersen, when reissuing its opinion on the 1975 consolidated financial statement, would have to make its decision based on information available to it from the prior years. In April 1977, ARC included its 1975 and 1976 consolidated financial statements for comparative purposes in its annual report to shareholders and its report to the SEC. At that time, Andersen reissued its original unqualified opinion with respect to the 1975 consolidated financial statement.

The second major factual setting regards a reinsurance agreement and is as follows. In 1973 and 1974, ARC and Reserve suffered substantial operating losses with respect to insurance written in previous years involving particularly high-risk and surplus liability lines of coverage. Such operating losses reduced Reserve's and Market's statutory surplus, and because of State insurance regulations, Reserve and Market were restricted in the amounts of insurance they could continue to write. This development jeopardized Reserve's and Market's ability to preserve their existing market structure.

In response to these adverse financial and business developments, Reserve, Market and GRC, another subsidiary of ARC and previous reinsurer for Reserve and Market, entered into a series of reinsurance agreements or treaties with Societe Commerciale De Reassurance (SCOR), a major European reinsurance company. Under the terms of these agreements, SCOR assumed a large percentage of premiums written by Reserve and Market and then immediately retroceded them to GRC. In consideration of these premiums SCOR paid to Reserve and Market a commission, but in return received a slightly higher commission from GRC. However, because the capitalization of GRC was insufficient to cover the potential losses involved in its assumption of the business from SCOR, ARC agreed to guarantee GRC's obligations to SCOR.

On March 15, 1975, an Andersen auditor submitted a handwritten memorandum that outlined the details of the SCOR treaties and described the apparent effect the treaties had on ARC and its subsidiaries. This memorandum stated that

> "Reserve needed surplus relief and Guaranty [GRC] didn't have enough surplus to provide it. SCOR provided the letter of credit as a financial mechanism and very little else."

The memorandum further stated:

> "In view of the 'quality' of the reported surplus, there appears to be a reasonable uncertainty as to the company's ability *** to remain in business ***."

Thereafter, Andersen conducted an audit of ARC's 1974 and 1975

consolidated financial statements and rendered an unqualified opinion with respect to each year.

Because the instant action was decided on a section 2—615 motion to dismiss that challenged the legal sufficiency of ARC's complaint, we find it necessary to state with some particularity the allegations contained in the six count complaint. Counts I and II respectively allege misrepresentation and breach of contract for Andersen's reissuance in 1977 of their unqualified opinion regarding ARC's 1975 financial statement. These counts allege that at the time Andersen reissued their opinion they knew that 1976 earnings had been reduced by $25 million so that an additional $25 million increase in 1975 loss reserves could be covered. The counts also allege that Andersen knew that this $25 million increase in loss reserves for 1975 meant that ARC was actually insolvent as of December 31, 1975, and that if adequate loss reserves had been included in the 1975 financial statements then ARC and Andersen would have had to report that insolvency. Counts I and II further allege that the inadequacy of loss reserves resulted not only from ARC's inadequate loss reserve methodology but also from Andersen's insufficient verification of that methodology.

Count III alleges misrepresentation for Andersen's failure to disclose on at least two occasions that the real reason for their discharge as ARC's independent accountants in 1975 was disagreements with management over the adequacies of loss reserves. Andersen stood by and permitted ARC to issue a misleading proxy statement regarding their discharge and maintained their silence when misleading comments in that regard were made at ARC's annual meeting.

Counts IV and V respectively allege misrepresentation and breach of contract regarding Andersen's failure to disclose in its audit that a reinsurance treaty which ARC's principal operating subsidiary, Reserve, had with an alien reinsurance company had the effect of hiding the shaky financial position and probable insolvency of Reserve, despite Andersen's admission that they knew these facts.

Count VI alleges that Andersen affirmatively participated in a misrepresentation with Coopers & Lybrand to characterize the $25 million loss reserve deficiency recorded in 1976 as a "change in estimate" rather than a "prior period adjustment." Count VI further alleges that calling the deficiency a "change in estimate" in light of Andersen's knowledge that ARC's loss reserve methodology was inadequate, that Andersen's test of that methodology was insufficient and that ARC would have been insolvent if reserves had been adequately recorded, resulted in misrepresentation.

Initially, it is necessary that we consider the issue of whether the

trustee for the estate of ARC has the requisite standing in order to bring the causes of action asserted. ARC contends that the liquidation trustee represents the estate of the debtor corporation and that he must pursue claims belonging to the estate. (See 4 Collier on Bankruptcy sec. 541.10 (15th ed. 1982).) ARC further contends that a corporation is comprised of a variety of interests including officers, inside directors, outside directors, managers, employees, shareholders and others and that the estate of the debtor corporation is made up of the interests of all the individuals in the corporate family. (See 1 Fletcher, Cyclopedia of the Law of Private Corporations secs. 4, 5 (perm. ed. 1983); 4 Collier on Bankruptcy sec. 541.10 (15th ed. 1982).) In its complaint, ARC specifically alleges that as a result of Andersen's misrepresentations and breaches of contract, "ARC's audit committee, investors, creditors and others" relied on said misrepresentations and breaches and thus were precluded from taking any steps towards alleviating the occurred damage or preventing any further damage to ARC. ARC asserts that while the instant causes of action may ultimately benefit ARC's creditors, the allegations contained in the complaint represent claims which belonged to ARC and thus are claims which the trustee can bring.

In response, Andersen agrees that the applicable rule of law is that the liquidation trustee can only pursue those claims which belong to the estate of the debtor corporation, ARC. However, Andersen contends that the claims asserted in the instant complaint belong to third parties, such as ARC's creditors and shareholders, and thus are outside the mandate of the trustee. In support of his position, Andersen cites *Caplin v. Marine Midland Grace Trust Co.* (1972), 406 U.S. 416, 32 L. Ed. 2d 195, 92 S. Ct. 1678. The supreme court in *Caplin* specifically held that a trustee in reorganization did not have standing under chapter X of the Bankruptcy Code to assert claims held by a group of debenture holders and that the trustee could only collect and reduce the money of the property of the estates to which he was trustee.

While this court does not dispute the validity of the law as stated in *Caplin,* we do not believe that it is applicable in the instant action. *Caplin* involved a reorganization trustee and also was subject to a specific Federal statute, the Trust Indenture Act of 1939, which served to circumscribe the scope of the trustees' powers. In the case at bar, Holland is a liquidation trustee, which the court in *Caplin* found to have a contradistinctive purpose from a reorganization trustee. Furthermore, ARC is asserting common law claims of misrepresentation and breach of contract, and thus we do not face limita-

tions such as the ones imposed by the Federal statute in *Caplin.* Therefore, we do not find Andersen's citation of *Caplin* to be controlling in the instant matter.

■ We do agree that a liquidation trustee may only pursue those claims which belong to the estate of the debtor corporation. (See 4 Collier on Bankruptcy sec. 541.10 (15th ed. 1983).) We further find that ARC's complaint alleges that various members of the corporation, its "audit committee, investors, creditors and others," were prevented from taking action on behalf of ARC because of Andersen's misconduct and that these allegations are sufficient at this stage of the litigation to maintain causes of action belonging to ARC. Therefore, the trustee for the estate of ARC has the capacity to bring the instant complaint.

We will next address the issue of misrepresentation and the question of whether the knowledge, acts and omissions of ARC's top management should be imputed to ARC and consequently to the trustee and therefore estop the trustee from asserting the instant causes of action. ARC contends that no such imputation can be permitted because the question regarding the knowledge, acts and omissions of ARC's top management involves questions of fact that cannot be properly decided on a motion to dismiss the complaint, and that, even if such actions of ARC's management are imputed to ARC, the imputation defense cannot be successful because the purported misconduct was not carried out on behalf of ARC but rather was against it. Andersen's response is two-fold; first, ARC has waived this argument on appeal by failing to raise it at the trial level, and second, the imputation doctrine can be applied as a matter of law, so that this issue is properly within the purview of the trial court on a motion to dismiss, and that ARC's top management engaged in misrepresentations on behalf of ARC.

Motions to dismiss under section 2—615 attack the legal sufficiency of the complaint, not the factual sufficiency. (*Cain v. American National Bank & Trust Co.* (1975), 26 Ill. App. 3d 574, 325 N.E.2d 799.) Moreover, a section 2—615 motion admits the well-pleaded facts in the complaint and cannot be used to present new matter whether by affidavit or otherwise. *Davis v. Weiskopf* (1982), 108 Ill. App. 3d 505, 439 N.E.2d 60.

■ With respect to Andersen's waiver argument, the record is clear that ARC's counsel did raise before the lower court the impropriety of Andersen making factual arguments on a motion to dismiss. On two separate occasions counsel for ARC specifically stated, "factual arguments certainly are improper on a motion to dismiss." We

believe that these comments made by ARC sufficiently defeat Andersen's waiver argument.

In Andersen's alternative response, irrespective of the procedural limitations imposed by a section 2—615 motion to dismiss, Andersen maintains that ARC has sufficiently alleged facts in its complaint and accompanying exhibits that clearly demonstrate that ARC's top management had knowledge of and had already done in a knowing fashion all that the defendant Andersen is charged with and that such actions by ARC's top management amounted to fraud on behalf of ARC. Accordingly, Andersen asserts that given this knowledge, ARC, through the application of the imputation doctrine, is precluded as a matter of law from recovering on its complaint.

A leading case applying the imputation doctrine in the area of accountant liability which both parties heavily rely on is *Cenco, Inc. v. Seidman & Seidman* (7th Cir. 1982), 686 F.2d 449, *cert. denied* (1982), 459 U.S. 880, 74 L. Ed. 2d 145, 103 S. Ct. 177. *Cenco* involved an action against Seidman & Seidman, Cenco's independent auditors, for fraud and breach of contract. During the time Seidman was Cenco's auditor, a massive inventory fraud involving Cenco's top management occurred. The evidence during trial revealed that in the early stages of the fraud Seidman had been careless in checking Cenco's inventory figures and its carelessness had prevented the fraud from being "nipped in the bud." Furthermore, as the fraud expanded, Seidman's auditors became suspicious but they concealed their suspicion and kept giving Cenco a clean bill of health. However, other evidence showed that Seidman had diligently attempted to follow up all signs of fraud, but that their attempts had been thwarted by efforts of Cenco's managers. The main issue in *Cenco* was whether the jury had been properly instructed that Seidman was entitled to use, through imputation, the wrongdoing of Cenco's managers as a defense against Cenco's allegations of breach of contract, negligence and fraud. The Seventh Circuit held that Sidman could use the imputation doctrine to defeat Cenco's claims. The court further concluded that the acts of Cenco's managers amounted to acts of fraud on behalf of the corporation as opposed to acts of fraud against the corporation and that policy and reason dictated that Cenco be precluded from recovering on claims of fraud from which it actually benefitted.

ARC argues that *Cenco* and the instant case are distinguishable in that the rationale for the Seventh Circuit's application of the imputation doctrine in *Cenco* cannot be properly used in the instant matter. The court in *Cenco* imposed the knowledge and acts of its managers on the plaintiff, Cenco, to serve as a defense against their claims

against Sidman because the evidence tended to show that the fraudulent acts of Cenco's managers were perpetrated for the benefit of the corporation. In the case at bar, the only evidence which this court can consider are the well-pleaded facts alleged in ARC's complaint. ARC argues that those allegations do not indicate that the purported misconduct of ARC's management was done for the benefit of the corporation. Rather, ARC contends that its complaint does allege that the misrepresentation that was committed was done so against the corporation to its detriment. ARC further argues that if any misconduct was committed by its top management then it is not possible to determine from the complaint, at this stage in the litigation, which personnel participated and to what degree they may have participated.

In further support of its position, ARC cites to *Schacht v. Brown* (7th Cir. 1983), 711 F.2d 1343, *cert. denied* (1983), 464 U.S. 1002, 78 L. Ed. 2d 698, 104 S. Ct. 508, a case closely related to the instant matter. In *Schacht,* the Illinois Director of Insurance, as liquidator of Reserve, ARC's principal operating subsidiary, brought suit against the officers, directors and independent accountants of ARC and Reserve (Andersen was included as one of the defendants) for fraud in connection with the failure to disclose the effects of a reinsurance agreement that rendered Reserve insolvent. This claim is remarkably similar to counts IV and V in the instant complaint. The defendants moved to dismiss the complaint on the grounds of *Cenco,* but the Seventh Circuit held *Cenco* to be inapplicable. The court found that *Cenco* limited its analysis to cases in which managers were not stealing from the company but stealing for its benefit, and that in *Schacht* the results of the fraudulent scheme engaged in by the defendants could in no way be described as beneficial to either Reserve or its parent, ARC. It indicated that the impact of the fraud was that Reserve was continued in business past its point of insolvency and concluded that the prolonged artificial insolvency of Reserve benefitted only Reserve's managers and the other alleged conspirators, not the corporation. *Schacht v. Brown* (7th Cir. 1983), 711 F.2d 1343, 1348.

In contrast to ARC's interpretation of *Cenco's* application to the instant matter, Andersen maintains that ARC's top management, just like Cenco's management, committed fraud on behalf of the corporation and accordingly, such conduct invokes the use of the imputation doctrine as a bar to ARC's causes of action. Specifically, Andersen contends that ARC's allegations clearly demonstrate that ARC, through its directors and officers, authored, orchestrated and actually perpetrated the alleged fraud, if any, and that any fraud committed was against outsiders, not against ARC.

Andersen further maintains that the application as a matter of law of the imputation doctrine, the doctrine in the instant case wherein the acts and knowledge of a corporation's management are attributed to the corporation itself, was reaffirmed in *Security America Corp. v. Schacht* (N.D. Ill. filed Jan. 31, 1983), No. 82—C—2132. In *Security America,* the court dismissed fraud allegations by a corporation against its accountants by imputing the acts of the corporation's management on the corporation. In *Security America,* the memorandum opinion and order stated:

"[T]he court holds that the particular fact pattern present in this case allows imputation as a matter of law. The directors of Security Casualty incorporated Security America for the purpose of issuing Security America's stock publicly and purchasing Security Casualty's stock with the proceeds. Security America's position in the alleged fraud is clear from the allegations, and it would be pointless for the court to receive evidence of how Stange, Burdett, Lanham, and Prangle acted with respect to Security America.

It is quite clear from the allegations that the alleged fraud— misrepresenting the assets and liabilities of Security Casualty— was a fraud on behalf of Security Casualty, not against it. 686 F.2d at 456. Also inescapable is the conclusion that Security America was not the victim of the fraud; the victims were those who paid money to Security America for its stock."

Based on *Cenco* and *Security America,* Andersen contends that the knowledge and acts of ARC's top management must be imputed to the trustee as a matter of law.

In order to affirm the trial court's granting of Andersen's motion to dismiss with regard to count I, we must determine that ARC's complaint and exhibits allege sufficient facts to find that the officers and directors of ARC did in a knowing fashion all that Andersen is charged with and that such actions by ARC's top management amounted to fraud on behalf of ARC.

The record reveals that in 1975 and 1976 ARC did decide on which methodology to use to determine loss reserves and that ARC did charge against its 1976 income $25 million for losses incurred with respect to claims relating to prior years. However, the record further reveals that at the time Andersen reissued its unqualified opinion in 1977 for ARC's 1975 consolidated financial statement, Andersen was aware that said opinion did not accurately reflect ARC's financial position. While such misconduct on the part of Andersen may also have been done in a knowing fashion by ARC, there are no

allegations in the complaint which establish that the purported misconduct on the part of ARC's top management was committed on behalf of ARC. The record reflects quite the contrary. ARC's complaint alleges that the purported misrepresentation served to artificially prolong ARC's business life past the point of insolvency and that various ARC executive personnel would have taken steps to at least minimize the damage already sustained had they known of the misrepresentations. Thus, the instant case is unlike *Cenco* and *Security America,* where the fraud was clearly committed by the companies' top management and as a result the companies were able to benefit. It does not appear that ARC benefitted from the alleged misconduct, and therefore the imputation doctrine as applied in the above two cases cannot be utilized in the instant matter.

As an additional consideration, ARC directs this court's attention to *Shapiro v. Glekel* (S.D.N.Y. 1974), 380 F. Supp. 1053. In *Shapiro,* a trustee in bankruptcy for a corporation brought an action against the corporation's accountants for their failure to accurately reflect the corporation's financial status. The trustee alleged that the accountants' malfeasance led the corporation to its financial downfall. The accountants moved to dismiss on the grounds that the corporation's management knew of the inaccuracy of the accountants' report and that such contributory negligence on the part of the employer would preclude the trustee from recovery.

However, the court found that accountants are commonly employed for the very purpose of detecting defalcations which the employers' negligence has made possible. Accordingly, the court held that negligence of the employer is a defense only when it contributed to the accountant's failure to perform his contract and to report the truth.

ARC asserts that the rationale espoused in *Shapiro* is instructive for a determination of the instant matter. ARC contends that, even if its top management was involved in the alleged misconduct, that Andersen should not be permitted to assert ARC's participation as a defense so as to absolve Andersen of its own misconduct. ARC argues that Andersen had a contractual obligation as ARC's independent auditors to protect ARC from implementing inaccurate accounting methods and that even ARC's knowing selection of such methods did not prevent Andersen from or interfere with Andersen's attempt to properly discharge its duties.

Andersen contends that *Shapiro* is inapposite to the instant case and does not serve any instructive purpose, in that *Shapiro* involves negligence and contributory negligence as opposed to misrepresenta-

tion. Andersen further argues that the court in *Shapiro* merely held that the claimed negligence of management in not knowing the true financial condition of the company did not constitute a defense to the alleged negligence of the accounting firm and that it did not hold that actual knowledge, such as the knowledge held by ARC's management, would not have been a defense.

■ While we do not find *Shapiro* to be controlling in the case at bar, we are interested in the rationale used by *Shapiro*. It appears to be sound reasoning to hold an accounting firm to its contractual obligations and that absent an intervening circumstance that prevents the firm from properly performing its duties, such as the employer's own misconduct, the accounting firm must so perform. In the instant case, seeing that the litigation is still at the pleading stages, it does not appear that there are any allegations in ARC's complaint or in its exhibits that indicate that ARC's management took any actions that prevented Andersen from properly conducting itself as ARC's independent auditors. This consideration, in conjunction with the prior analysis of the imputation doctrine, serves to further convince this court that Andersen is not entitled to impute the actions of ARC's top management on the trustee so as to prevent the continuation of the instant lawsuit. Accordingly, the trial court should not have dismissed count I of ARC's complaint.

With regard to count IV, ARC contends that this count alleges sufficient facts to indicate that Andersen knew that the surplus generated for Reserve by the SCOR treaty was nothing more than a paper entry to mask that subsidiary's insolvency, and that despite such knowledge Andersen still rendered an unqualified opinion for the 1975 consolidated financial statement. ARC further contends that as a result of Andersen's knowing failure to issue an opinion that accurately reflected the true financial condition of ARC and its subsidiary, that certain executive personnel of ARC relied on Andersen's opinion and consequently failed to take appropriate steps to further prevent ARC's financial demise. In response, Andersen argues that ARC and its directors and officers possessed all knowledge of the effect the reinsurance agreements with SCOR had on ARC and the adverse financial conditions that led to the SCOR agreements and that therefore ARC was not deceived in any respect.

■ The case law and discussion regarding the imputation doctrine argued above with respect to count I is equally applicable to count IV. ARC has alleged sufficient facts in order for the court to reasonably infer that Andersen knowingly failed to issue an opinion which accurately reflected the true financial condition of ARC. More-

over, even if it can be determined that ARC's top management actively participated in this fraudulent scheme, we find that ARC has alleged sufficient facts which indicate that ARC did not benefit from the misconduct. ARC has alleged that it has been damaged by the SCOR agreement by being artificially maintained in business past the point of insolvency. The court in *Schacht* found this factual situation to work against the interest of ARC to its detriment and we agree. Accordingly, count IV of the complaint should not have been dismissed.

Counts II and V are both breach of contract claims which respectively involve Andersen's 1977 reissuance of its unqualified opinion and Reserve's reinsurance agreement with SCOR. ARC contends that an accountant who contracts to perform auditing services impliedly promises to use the degree of skill, care and competence expected of accountants and that accountants may be sued for breach of contract for failure to perform that promise. Alternatively, ARC contends that its complaint does allege that Andersen contracted for a specific result and that Andersen breached the contract by failing to so perform. In response, Andersen argues that it only contracted to provide services in conformity with generally accepted auditing standards and that any such failure to perform resulted in a malpractice action, not a contract action. It further argues that the damages sought by ARC in counts II and V are tort, not contract, damages and thus reveal the true nature of ARC's action.

Counts II and V specifically allege that Andersen expressly promised to provide services pursuant to an engagement letter between it and ARC. That letter expressly provided that Andersen would conduct its audit "in accordance with generally accepted auditing standards *** and all irregularities coming to its attention would be reported." It further alleged that Andersen impliedly agreed to render its services with the requisite skill, care, knowledge and judgment usually possessed by members of the accounting profession. In count II, ARC alleges that Andersen breached the contract by failing to disclose the inaccuracy of ARC's loss reserve methodology, the insufficiency of Andersen's tests of that methodology and the impact of the $25 million reserve deficiency. In count V, ARC alleges that Andersen breached the contract by failing to disclose the impact that the SCOR reinsurance treaty had on the financial position of ARC and its subsidiaries.

■ The record reveals that Andersen expressly promised to disclose all irregularities that came to its attention and that in performing the task of disclosing any irregularities, Andersen impliedly

agreed to conduct itself with the degree of skill, care and competence expected of accountants. (See *Zostautas v. St. Anthony DePadua Hospital* (1961), 23 Ill. 2d 326, 178 N.E.2d 303; *Board of Education v. Del Bianco & Associates* (1978), 57 Ill. App. 3d 302, 372 N.E.2d 953.) Both counts II and V allege that Andersen became aware of facts that tended to indicate that ARC and its subsidiaries were insolvent. It is further alleged that Andersen rendered an unqualified opinion on ARC's 1975 consolidated financial statement and then reissued that unqualified opinion in 1977, knowing that those financial statements did not accurately reflect ARC's true financial condition. Considering that the instant action is only at the pleading stages, it can reasonably be inferred from ARC's allegations that Andersen became aware of irregularities with respect to both ARC's loss reserve methodology and Reserve's reinsurance treaty with SCOR and that Andersen failed to disclose those irregularities both when it issued its unqualified opinion in 1975 and then again when it reissued that opinion in 1977. Accordingly, without the advantage of further inquiry, it appears that ARC has alleged sufficient facts to infer that Andersen contracted with ARC for a specific result, namely, disclosing any known irregularities, and breached that contract when it failed to provide that promised result.

Furthermore, we find that Andersen's argument with respect to the damages claimed by ARC in the contract counts lacks merit. Andersen argues that ARC has actually claimed tort damages because it claims the same damages as those claimed in the misrepresentation counts. It further argues that if ARC was actually seeking contract damages, then it would have sought the difference between the value of the alleged defective audit and the contract price.

■ In order to strike an allegation from a complaint, the moving party must state with particularity the alleged defects therein. (Ill. Rev. Stat. 1983, ch. 110, par. 2—615(b).) The arguments offered by Andersen at best raise factual questions as to the nature of the actions asserted, but as we have consistently held in the instant matter, because this case was decided on a section 2—615 motion, we will not strike the pleadings when factual matters remain to be resolved. Accordingly, the trial court erred in striking counts II and V of ARC's complaint.

Count VI alleges that Andersen affirmatively participated in a misrepresentation with Coopers & Lybrand to characterize the $25 million loss reserve deficiency recorded in 1976 as a "change in estimate" rather than a "prior period adjustment." Andersen responds that count VI is not an action for misrepresentation but rather it al-

leges liability for a civil conspiracy, a cause of action not available under Illinois law. Thus, it was properly dismissed. Alternatively, Andersen briefly asserts that both count I and count VI allege the same misrepresentation. ARC contends that both Andersen and the trial court inaccurately characterized this count as one sounding in conspiracy. ARC does not assert that there is a separate cause of action in Illinois for conspiracy, but rather asserts that it has added allegations of conspiracy to the allegations of the underlying misrepresentation for the purpose of associating all the co-conspirators with the acts done and declarations made. ARC further contends that the allegations of misrepresentation in count I are separate and distinct from those allegations contained in count VI. In support of this position ARC argues that even if Andersen had reissued in 1977 their 1975 opinion as a qualified opinion and disclosed the facts they failed to disclose, as alleged in count I, the misrepresentation of the $25 million deficiency as a "change in estimate" would still be fraudulent.

■ The record reveals that ARC has alleged sufficient facts to maintain a count for misrepresentation. However, Andersen has directed its argument to the proposition that count VI is one for conspiracy and thus cannot be permitted to stand. This court does not read count VI as a conspiracy count. There are certain allegations of conspiracy contained within count VI, but the gist of the count is focused on the underlying misrepresentation. Having already determined that ARC has alleged sufficient facts in count VI to maintain a cause of action for misrepresentation, and considering that this action has only progressed to the pleading stages, we conclude that count VI should not have been dismissed but rather should proceed to trial for further inquiry into its merits. Accordingly, the decision to dismiss count VI is also reversed.

■ Lastly, we must consider count III of ARC's complaint. Count III alleged misrepresentation for Andersen's failure to disclose the real reason for Andersen's dismissal as ARC's independent accountants. The trial court dismissed count III on grounds that Andersen owed no duty to make any such disclosures and that if there was any misconduct regarding the filing of the SEC form then such actions belong in the Federal court. We agree with the trial court. Regardless of the fact that Andersen may have known that it was being replaced as ARC's accountant primarily as a result of disputes regarding ARC's loss reserves, we fail to see where it was incumbent upon Andersen to disclose such information, especially in light of the fact that ARC has failed to argue exactly what duty Andersen was under. Furthermore, as the trial court held, if there are any claims with respect to

the SEC form filed, then such actions clearly are to be brought in the Federal courts. Therefore, the dismissal of count III is affirmed.

Based on the foregoing discussion, the dismissal of counts I, II, IV, V, and VI is reversed and the dismissal of count III is affirmed. This action is remanded for a trial on the merits.

Reversed in part, affirmed in part.

JOHNSON and ROMITI, JJ., concur.