**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver; American Diversified Savings Bank; ADC Financial Corp.; American Diversified Wells Park III, et al., Plaintiffs–Appellants,**

v.

**O'MELVENY & MEYERS, Defendant–Appellee.**

No. 90–55769.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 12, 1991.

Decided June 29, 1992.

---

Theodore A. Russell, Pettit & Martin, San Francisco, Cal., for plaintiffs-appellants.

Gregory R. Smith, Irell & Manella, Los Angeles, Cal., for defendant-appellee.

Before: POOLE, KOZINSKI, and LEAVY, Circuit Judges.

POOLE, Circuit Judge:

The Federal Deposit Insurance Corporation ("FDIC"), as receiver for the failed savings and loan association American Diversified Savings Bank ("ADSB"), sued the law firm of O'Melveny & Meyers ("O'Mel-

veny" or "the Firm") claiming professional negligence in connection with its legal advice and services to ADSB. After reviewing *de novo* the district court's grant of O'Melveny's summary judgment motion, we reverse and remand to the district court for further proceedings.

## I

### Facts and Procedural History [1]

ADSB was acquired in 1983 by Ranbir Sahni and Lester Day. Sahni served as Chairman and Chief Executive Officer of ADSB, and Day was its President. ADSB's principal activity was the purchase, development and sale of real estate through limited partnerships sponsored by ADSB and its subsidiaries. These activities were funded by ADSB's insured deposits, which totaled $958 million by December, 1985. ADSB's deposits were insured by what was then known as the Federal Savings and Loan Insurance Corporation ("FSLIC").[2]

In September, 1985, ADSB retained O'Melveny, one of the largest and most prominent law firms in the country, to assist with two real estate syndications, Wells Park and Gateway Center. O'Melveny undertook that assistance in the preparation of two "Private Placement Memoranda" ("PPMs"), 300–page documents designed to induce outside investors to become limited partners in the two real estate deals. O'Melveny is described in the Wells Park and Gateway Center PPMs "as special counsel ... to the General Partner and its Affiliates in connection with Federal Securities laws, Federal income tax law, and certain other matters." [Stip. ¶ 133; Exh. 65, 67.] O'Melveny wrote substantial

portions of the PPMs, edited other portions and performed a due diligence review to confirm the accuracy and completeness of the PPMs' disclosures.[3]

The parties dispute whether the PPMs indicated that the success of the projects was linked to the financial and regulatory health of ADSB, and the extent to which they represented that ADSB was in sound financial and regulatory condition. There is no dispute, however, that ADSB's financial condition was in fact far from sound. The parties agree that Sahni, Day and Wyn Pope, Executive Vice President of ADSB, had intentionally and fraudulently overvalued ADSB's assets, engaged in the sham sale of assets in order to create inflated "profits," and generally "cook[ed] the books." [Stip. ¶¶ 74, 75, 94, 95, 216; Exhs. 32, 100, 101.]

In April, 1985, ADSB's officers had decided to terminate Touche, Ross & Co. as the corporation's auditor, alleging publicly that the accounting firm was "too expensive." [Stip. ¶¶ 65, 66, 71.] ADSB replaced Touche Ross with Arthur Young & Company. By October, 1985, Arthur Young began to express concerns about ADSB's financial condition. ADSB engaged yet a third accounting firm, Coopers & Lybrand, to review the Gateway Center offering. On May 3, 1985, more than five months before the private placement offerings were sold to the investor, Touche Ross had notified ADSB, Rogers & Wells (then ADSB's attorneys), and federal regulators that they believed ADSB's net worth was less than zero.

In September, 1985, Rogers & Wells determined that up-to-date audited financial

---

1. Since this is an appeal from a summary judgment order, the facts have not been developed at trial. However, the parties have stipulated to certain facts. Disputed factual assertions are noted.

2. The Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989), abolished the FSLIC and transferred its liabilities and assets to the FSLIC Resolution Fund, of which FDIC is the manager. *Id.*, § 401(a)(1); § 215(a). FDIC was substituted as a party to this case under

FIRREA § 401(f)(2). The federal regulatory agency is referred to hereinafter as "FDIC."

3. *The parties disagree about the precise capacity in which the Firm was hired. O'Melveny argued on appeal that "special counsel" meant tax counsel and not securities counsel. FDIC offered the Declaration of Jerry W. Carlton, O'Melveny partner and "primary partner contact" with ADSB, to support FDIC's contention that the "special counsel" role encompassed substantial assistance with the preparation of the PPMs as well as tax opinions.*

statements for ADSB were necessary for the "Hickory Trace" Offering, a private placement it was then preparing. Audited statements were never prepared, that particular private placement never closed, and ADSB completed the transfer of its business from Rogers & Wells to O'Melveny.

In the course of preparing the Gateway Center PPM, O'Melveny never communicated with Arthur Young, Touche Ross, Rogers & Wells, or ADSB's federal or state regulators. Nor did O'Melveny ever communicate with Day, Pope or James Miller, ADSB's Chief Financial Officer. Indeed, Arthur Young was not aware that O'Melveny had included Arthur Young's March 31, 1985 audited financial statement, by then almost six months out of date, in the Gateway Center PPM. The Wells Park and Gateway Center offerings closed on December 31, 1985.

On February 14, 1986, FDIC stepped in as conservator for ADSB, having concluded that ADSB was insolvent and that the corporation had incurred a substantial dissipation of assets and earnings due to its violations of laws and regulations and its unsafe and unsound business practices. On February 19, 1986, FDIC, as conservator for ADSB, filed a lawsuit in the Central District of California alleging breach of fiduciary duty against Sahni and Day, and RICO violations against Sahni.

Shortly after FDIC took over, it began receiving complaints from investors claiming they had been misled by the PPMs and demanding the return of their investments. FDIC, having made its own finding that the PPMs were misleading, offered to have the partnerships that controlled Wells Park and Gateway Center rescind the investments. The rescission was funded by a loan from American Diversified Capital Corporation (ADCC), a wholly-owned subsidiary of ADSB, to the offering partnerships. In accepting the rescission offer, each investor assigned to FDIC "all actions, causes of action, claims, or suits of any kind or nature whatsoever against any person or entity arising from the Initial Offering...." [Offer of Rescission, Exh. 99] On May 12, 1989, FDIC commenced this suit against O'Melveny, charging the Firm with professional negligence, negligent misrepresentation, and breach of fiduciary duty.

At a settlement conference, the parties agreed to stipulate to a single set of facts and to test their legal claims in a summary judgment motion. O'Melveny argued before the district court that (1) it owed no duty to ADSB or its affiliates to ferret out ADSB's own fraud; (2) the conduct of ADSB's wrongdoing officers must be imputed to ADSB, and that FDIC, as receiver, stood in the shoes of ADSB; (3) and that therefore, as an ordinary assignee, FDIC was barred from pursuing any claims against O'Melveny. O'Melveny also argued that the investors' claims had been extinguished by repayment and that the investors' claims were barred by California's statute of frauds. The district court, specifying only that it perceived the existence of no genuine issue of material fact, granted O'Melveny's motion for summary judgment. FDIC appealed. We reverse.

## II

### Standard of Review

A trial judge should grant summary judgment under Fed.R.Civ.P. 56(c) if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." *Id.; see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). We review *de novo* the district court's grant of summary judgment. *See, e.g., Kruso v. International Tel. & Tel. Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989), *cert. denied*, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). The evidence must be viewed in the light most favorable to the nonmoving party to determine whether there are any genuine issues of material fact for trial, and whether the district court correctly applied the relevant substantive law. *Gizoni v. Southwest Marine, Inc.*,

909 F.2d 385, 387 (9th Cir.1990), *aff'd*, —— U.S. ——, 112 S.Ct. 486, 116 L.Ed.2d 405 (1991).

## III

### The Duty of Care

■ O'Melveny must have violated a duty in order to be found negligent. The Firm concedes the existence of a duty by a principal and its agent of complete and accurate disclosure to potential investors in a securities offering, but argues that the investors here have all been fully compensated, and that the agent owes no additional duty to the successor in interest of a principal to make inquiries and disclose information which, the Firm argues, the principal already knew and was trying to conceal. In other words, O'Melveny contends that the federal agency created by Congress to rescue the economy and the victims of failing thrifts can claim no stronger ethical position than did the wrongdoers within that corporate entity; that the government agency is subject to all defenses that might lie as between the wrongdoers themselves and those who may have aided and abetted them in bringing about the disaster. We find such a proposition incredible, particularly when applied to the duties of attorneys retained to give advice and assistance with respect to public offerings.

Our starting point is the basic proposition that in general, "it is an attorney's duty to 'protect his client in every possible way....'" *Day v. Rosenthal*, 170 Cal. App.3d 1125, 1143, 217 Cal.Rptr. 89, 99 (1985) (citations omitted), *cert. denied*, 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986). Attorneys fulfill this duty by performing the legal services for which they have been engaged with "such skill, prudence and diligence as lawyers of ordinary skill and capacity commonly possess...."

*Id., quoting Lucas v. Hamm*, 56 Cal.2d 583, 591, 15 Cal.Rptr. 821, 825, 364 P.2d 685, 689 (1961), *cert. denied*, 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962).[4]

Furthermore, if an attorney "specializes within the profession, he must meet the standards of knowledge and skill of such specialists." *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal.3d 176, 188, 98 Cal.Rptr. 837, 844, 491 P.2d 421, 428 (1971). An attorney's failure to perform in accordance with his duty is negligence, because "[e]ven as to doubtful matters, an attorney is expected to perform sufficient research...." *Smith v. Lewis*, 13 Cal.3d 349, 360, 118 Cal.Rptr. 621, 628, 530 P.2d 589, 596 (1975), *overruled on other grounds, In re Marriage of Brown*, 15 Cal.3d 838, 126 Cal.Rptr. 633, 544 P.2d 561 (1976); *Day v. Rosenthal*, 170 Cal.App.3d at 1146–47, 217 Cal.Rptr. 89.

■ O'Melveny's position is that a lawyer owes no duty to uncover a client's fraud nor to advise the client and the world of that fraud. The Firm points out that California has recently reiterated its traditionally narrow construction of attorney malpractice exposure under California law. *See Kimmel v. Goland*, 51 Cal.3d 202, 213–14 n. 10, 271 Cal.Rptr. 191, 198 n. 10, 793 P.2d 524, 531 n. 10 (1990); *Skarbrevik v. Cohen, England & Whitfield*, 231 Cal. App.3d 692, 701–707, 282 Cal.Rptr. 627, 633–37 (1991). There are two problems with O'Melveny's approach. The first is the implication that if the client happens to be committing a fraud, of which the attorney may or may not be aware, the presence of the fraud cancels the attorney's duty to use due care. No California cases advise us of an exception to the general rule that a lawyer has to act competently to avoid public harm when he learns that his is a dishonest client. The *Skarbrevik* and *Kimmel* cases merely decline to expand

---

**4.** *See also* California Supreme Court, *Rules of Professional Conduct* (1989), *reprinted in Selected Standards on Professional Responsibility* (D. Morgan & R. Rotunda, eds. 1991): "To perform legal services competently means diligently to apply the learning and skill necessary to perform the [attorney's] duties arising from employment or representation." *Id.* at 246. While

professional standards are not meant to give rise to civil liability, we find that "[t]he attempt to deny that there is anything in these codes of conduct that is relevant to the legal duty owed by a lawyer to his client is simply breathtaking. It is also quite wrong." A. Kaufman, *Problems in Professional Responsibility* 662 (3d ed. 1989).

this duty of attorneys; they do not create any exceptions to it.

 The second problem with O'Melveny's approach is its sharp differentiation between a "duty to investors," which it concedes, and a "duty to the client," which it denies. Given a broad duty to protect the client, this distinction is a false one. Part and parcel of effectively protecting a client, and thus discharging the attorney's duty of care, is to protect the client from the liability which may flow from promulgating a false or misleading offering to investors. An important duty of securities counsel is to make a "reasonable, independent investigation to detect and correct false or misleading materials." *Felts v. National Account Sys. Assoc., Inc.,* 469 F.Supp. 54, 67 (N.D.Miss.1978). This is what is meant by a due diligence investigation. *Koehler v. Pulvers,* 614 F.Supp. 829, 845 (S.D.Cal.1985) (due diligence required lawyer's independent investigation of information supplied by issuer for incorporation into offering materials). The Firm had a duty to guide the thrift as to its obligations and to protect it against liability. In its high specialty field, O'Melveny owed a duty of due care not only to the investors, but also to its client, ADSB.

 O'Melveny asserts that the Firm's attorneys "were deeply concerned with the proper portrayal of ADSB in the Gateway Center and Wells Park PPMs." FDIC's expert witness, Alan Berkeley, testified that in the circumstances of this case, fundamental due care required O'Melveny to contact Arthur Young, Touche Ross, and Rogers & Wells prior to signing and releasing the PPMs. The reasons for O'Melveny's lack of success in designing an accurate offering document constitute a triable issue of fact. Were a subsequent trier of fact to determine that O'Melveny had indeed been negligent, the Firm's negligence would not be based upon its declination to "ferret out fraud", but rather because it failed to make a reasonable, independent investigation. As one commentator has explained:

> [A]ttorneys, in rendering opinions relating to the securities laws, are not jus-

tified in assuming facts as represented to them by the client and in basing their opinion on the assumption that such facts are correct. Rather ... the attorney must make a reasonable effort to independently verify the facts on which the opinion is based.

H. Bloomenthal, *Securities Law Handbook,* § 27.02 at 1096 (1990–91 ed.).

## IV

### Estoppel

Given a basic duty to give proper advice to the client who is asking the public to invest in its offerings, the next inquiry is whether the attorneys are absolved of that duty if there were wrongdoing officers inside the corporation. O'Melveny argues that the acts of the wrongdoing officers are attributable to the corporation itself, and because FDIC "stands in the shoes" of the corporation as its receiver, by transference, FDIC is entitled to no more than the wrongdoing officers themselves would have been. Under this argument, FDIC would be estopped from making a claim against O'Melveny by the wrongdoing of the corporate insiders. We disagree with this flat statement of the law, particularly in view of the public expectation that the wrongdoing will be exposed, the wrongdoers pursued, and the innocent victims of fraud will have a chance at recovering.

### A

### The Thrift's Corporate Identity

 O'Melveny bases its position on the unexceptionable general principle that the perpetrator of a fraud cannot be a victim of that fraud. ADSB has no identity separate from that of Sahni and Day, argues O'Melveny, and Sahni and Day as wrongdoers could not have been victimized by O'Melveny's supposed negligence. O'Melveny asserts that "even if it were careless," FDIC cannot pursue a claim against O'Melveny because FDIC stands in the shoes of the wrongdoers at ADSB, and FDIC's claims for relief are "barred by the plaintiff's unclean hands."

We thus begin this section of our inquiry with the issue of ADSB's corporate identity. Could this case, as O'Melveny has urged, have just as appropriately been entitled "Sahni and Day v. O'Melveny & Meyers"?

▪ ADSB was the client here, not Sahni and Day. The misconduct of ADSB insiders provides O'Melveny with a defense only if the insiders' knowledge could be attributed to ADSB. Because these wrongdoers were acting adversely to ADSB and not on its behalf, principles of corporate identity and agency law preclude attribution, starting with the basic distinction between a corporation and its stockholders. "It is fundamental, of course, that a 'corporation is a distinct legal entity separate from its stockholders and from its officers.'" *Merco Constr. Eng'rs v. Municipal Court*, 21 Cal.3d 724, 729, 147 Cal.Rptr. 631, 634, 581 P.2d 636, 639 (1978) (citations omitted). This rule applies even when, as here, a single individual owns nearly all of the corporation's stock. *In re John Koke Co.*, 38 F.2d 232, 233 (9th Cir.1930) *cert. denied sub nom. A.R. Demory Invest. Co. v. Haese*, 282 U.S. 840, 51 S.Ct. 21, 75 L.Ed. 746 (1930); *Potts v. First City Bank*, 7 Cal.App.3d 341, 345–46, 86 Cal.Rptr. 552, 555 (1970).[5]

We next inquire whether Sahni and Day's wrongdoing as corporate *officers* can appropriately be attributed to ADSB.[6] "Generally the knowledge of a corporate officer within the scope of his employment is the knowledge of the corporation.... [, however,] the knowledge acquired by the agent who is acting adversely to his principal will not be attributed to the principal." *Meyer v. Glenmoor Homes, Inc.*, 246 Cal. App.2d 242, 264, 54 Cal.Rptr. 786, 800–801 (1967) (citations omitted); *see also In re Investors Funding Corp.*, 523 F.Supp. 533, 540–41 (S.D.N.Y.1980) (holding that the misconduct of officers is not attributable to

the corporation); *Holland v. Arthur Andersen & Co.*, 127 Ill.App.3d 854, 862–68, 82 Ill.Dec. 885, 890–94, 469 N.E.2d 419, 424–28 (1984) (sustaining an insurance company's malpractice claim against a debtor company's auditors, the court held that there could be no attribution of the knowledge of the debtor company's wrongdoers to the corporation because the wrongdoers were acting against the interests of the corporation).

▪ The cases of *Schacht v. Brown*, 711 F.2d 1343 (7th Cir.1983), *cert. denied*, 464 U.S. 1002, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983); *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir.1982), *cert. denied*, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982); and *Investors Funding* all turn on whether a corporate plaintiff (or, as here, its receiver) is estopped from recovering for the defendant's breach of duty because of the fraud of insiders. The holdings in *Schacht* (followed by this Circuit in *Kempe v. Monitor Intermediaries, Inc.*, 785 F.2d 1443, 1444 (9th Cir.1986)), *Cenco* and *Investors Funding* determine that there can be no attribution, and therefore no estoppel, when the insiders, rather than the corporation, benefit from the wrongdoing. *Schacht* at 1348; *Cenco* at 454–56; *Investors Funding* at 541.

▪ Here, disaster, not benefit, accrued to ADSB through the malfeasance of Sahni, Day and Pope. *Schacht* and *Investors Funding* elaborate that conduct aggravating a corporation's insolvency and fraudulently prolonging its life does not benefit that corporation. Indeed, under *Schacht*, even if the corporation were somehow to benefit from the wrongdoing of insiders, the insiders' conduct is still not attributable to the corporation if a recovery by the plaintiff would serve the objectives of tort liability by properly compensating the victims of the wrongdoing and deterring future wrongdoing. 711 F.2d at 1348; *ac-*

---

**5.** *Meehan v. Hopps*, 144 Cal.App.2d 284, 301 P.2d 10 (1956) is not to the contrary. That case actually held that corporate counsel do not have an attorney-client relationship with the corporation's shareholders. *See id.* at 293, 301 P.2d at 15. Subsequent California cases follow the holding in *Meehan*. *See, e.g., Ward v. Superior*

*Court*, 70 Cal.App.3d 23, 32–33, 138 Cal.Rptr. 532, 537 (1977).

**6.** Sahni and Day played two roles in relation to the corporation: as shareholders and as directors.

cord, Cenco, 686 F.2d at 455; see also Lincoln Sav. & Loan Ass'n v. Wall, 743 F.Supp. 901 (D.D.C.1990); Diamond Mortgage Corp. v. Sugar, 913 F.2d 1233, 1247–48 (7th Cir.1990) (applying Investors Funding to legal malpractice claims of corporations in bankruptcy against their pre-bankruptcy attorneys), cert. denied, — U.S. —, 111 S.Ct. 968, 112 L.Ed.2d 1054 (1991).[7]

Furthermore, we note that O'Melveny cannot invoke an estoppel defense unless it is innocent itself. See, e.g., Meyers v. Moody, 693 F.2d 1196, 1208 (5th Cir.1982) ("A party may not invoke an estoppel for the purpose of shielding himself from the results of his own fraud, dereliction of duty, or other inequitable conduct."), cert. denied, 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983).[8] We conclude that ADSB has a corporate identity distinct from that of its wrongdoing officers.

## B

### Role and Rights of FDIC

Even assuming Sahni and Day's knowledge would be imputed to ADSB so that ADSB would be estopped from bringing this lawsuit, this does not answer the question whether FDIC as receiver is estopped; there remains the problem of asserting against ADSB's successor an equitable defense that is good against ADSB. O'Melveny argues that under well-established California law, "[a] receiver occupies no better position than that which was occupied by the ... party for whom he acts ... and any defense good against the original party is good against the receiver." Allen v. Ramsay, 179 Cal.App.2d 843, 854, 4 Cal.

Rptr. 575 (1960). Thus, if O'Melveny can raise an equitable estoppel defense against ADSB, it can raise it against receiver FDIC as well.

The flaw in this argument is the law O'Melveny assumes applies. It is by now clear beyond doubt that federal, not state, law governs the application of defenses against FDIC.[9] While we may incorporate state law to provide the federal rule of decision, we are not bound to do so. See FDIC v. New Hampshire Ins. Co., 953 F.2d 478, 481 (9th Cir.1991), amended, 953 F.2d 478 (9th Cir.1992). Thus, contrary to O'Melveny's argument, we are not bound by state law, but must instead establish federal law.

In fashioning a federal rule of decision, we are guided by the age-old principles that equity does equity, see Van Rensselaer v. Kearney, 52 U.S. (11 How.) 297, 325, 13 L.Ed. 703 (1850), and that "[e]quity will look through the form of the transaction, and adjust the equities of the parties with a view to its substance,...." Drexel v. Berney, 122 U.S. 241, 254, 7 S.Ct. 1200, 1205, 30 L.Ed. 1219 (1887) (internal quotations omitted). These principles lead us to conclude that equitable defenses good against a bank do not carry over against the bank's receiver.

A receiver, like a bankruptcy trustee and unlike a normal successor in interest, does not voluntarily step into the shoes of the bank; it is thrust into those shoes. It was neither a party to the original inequitable conduct nor is it in a position to take action prior to assuming the bank's assets to cure any associated defects or force the bank to pay for incurable defects. This places the

---

7. Blain v. Doctor's Company, 222 Cal.App.3d 1048, 1062, 272 Cal.Rptr. 250 (1990) is not to the contrary. There, a client was held to have "no cause of action for injury caused by his own misconduct," id. at 1062, 272 Cal.Rptr. at 258, whereas in the present case, we determine that attribution of the insider's wrongdoing to FDIC is inappropriate.

8. We are unpersuaded by O'Melveny's contrary citation to McKenney v. Ellsworth, 165 Cal. 326, 132 P. 75 (1913). The exception from McKenney does not apply because O'Melveny is not an innocent third party in this case. Cases where

innocent victims of an agent's wrongdoing sue the principal are inapposite in this context. See, e.g., Warshauer v. Bauer Constr. Co., 179 Cal. App.2d 44, 3 Cal.Rptr. 570 (1960); Maron v. Swig, 115 Cal.App.2d 87, 251 P.2d 770 (1952).

9. See D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 456, 62 S.Ct. 676, 679, 86 L.Ed. 956 (1942); FDIC v. Bank of San Francisco, 817 F.2d 1395, 1398 (9th Cir.1987); see also FDIC v. Mmahat, 907 F.2d 546, 550 (5th Cir.1990), cert. denied, — U.S. —, 111 S.Ct. 1387, 113 L.Ed.2d 444 (1991); FDIC v. Gulf Life Ins. Co., 737 F.2d 1513, 1517 (11th Cir.1984).

receiver in stark contrast to the normal successor in interest who voluntarily purchases a bank or its assets and can adjust the purchase price for the diminished value of the bank's assets due to their associated equitable defenses. In such cases, the bank receives less consideration for its assets because of its inequitable conduct, thus bearing the cost of its own wrong.

Also significant is the fact that the receiver becomes the bank's successor as part of an intricate regulatory scheme designed to protect the interests of third parties who also were not privy to the bank's inequitable conduct. That scheme would be frustrated by imputing the bank's inequitable conduct to the receiver, thereby diminishing the value of the asset pool held by the receiver and limiting the receiver's discretion in disposing of the assets. *See Gulf Life,* 737 F.2d at 1517; *cf. Langley v. FDIC,* 484 U.S. 86, 91–92, 108 S.Ct. 396, 401–02, 98 L.Ed.2d 340 (1987).

In light of these considerations, we conclude that the equities between a party asserting an equitable defense and a bank are at such variance with the equities between the party and a receiver of the bank that equitable defenses good against the bank should not be available against the receiver. To hold otherwise would be to elevate form over substance—something courts sitting in equity traditionally will not do. *See Drexel,* 122 U.S. at 254, 7 S.Ct. at 1205. Of course, it does not necessarily follow that equitable defenses can never be asserted against FDIC acting as a receiver; we hold only that the bank's inequitable conduct is not imputed to FDIC.

## V

### The Measure of Damages

If FDIC is successful in this case, the appropriate measure of damages would be the out of pocket costs to the client properly attributable to the fraudulent transaction. This would include a denial of O'Melveny's cross-claim for its fees, rescission of any fees paid to O'Melveny, settlement costs, brokers' commissions, and any losses on property purchased as a re-

sult of the offerings having closed, provided such losses can be documented with the requisite level of certainty at trial. FDIC is not seeking reimbursement for the rescission payments to the investors, which were underwritten by a subsidiary of ADSB.

## VI

### Conclusion

We hold that O'Melveny owed a duty of care to its client ADSB and that there are genuine disputes of material fact as to whether that duty was discharged. The case is yet to be tried; we do not assume how the dispute will eventually be resolved, but we find there to be issues for trial. We also hold that FDIC, acting as an involuntary successor in interest pursuant to a federal regulatory scheme, is not estopped from litigating its claims against O'Melveny because of the "unclean hands" of the ADSB insiders. The judgment of the district court which held as a matter of law that no issues of material fact could be proved because FDIC has no standing is erroneous and therefore that judgment is hereby REVERSED and REMANDED for further proceedings consistent with this opinion.