**In re CENDANT CORPORATION SECURITIES LITIGATION.**

**This document Relates to: All Actions Except Prides.**

**No. 98–CV–1664(WHW).**

United States District Court, D. New Jersey.

April 16, 2001.

Douglas Eakeley, Lowenstein Sandler PC, Roseland, NJ, for E & Y.

Carl Greenberg, Budd Larner Gross Rosenbaum, Greenberg & Sade, P.C., Short Hills, NJ, for Cendant.

## OPINION

Walls, District Judge.

Ernst & Young ("E & Y") moves to dismiss all Amended Cross–Claims by Cendant against it on various theories. Oral argument was heard January 22, 2001, and the Court requested additional submissions on the issue of how settlement proceeds could be allocated to the plaintiffs' Section 10 and Section 11 claims, if at all. After consideration of the parties' submissions and oral arguments, the Court

grants E & Y's motion to dismiss Count VIII, but denies the motions to dismiss all other counts.

## BACKGROUND

In December 1997, CUC International, Inc. acquired HFS in a stock-for-stock merger. CUC was the surviving corporation and was renamed Cendant. For purposes of this motion, the Court will presume the parties' familiarity with the extensive background of this litigation. *See In re Cendant Corporation Sec. Litig.*, 109 F.Supp.2d 235 (D.N.J.2000) (approving settlement agreements between consolidated class and Cendant and E & Y); *In re Cendant Corporation Sec. Litig.*, 109 F.Supp.2d 225 (D.N.J.1999) (denying motions to dismiss various cross claims by E & Y against Cendant and other defendants).

In the lead case, Cendant filed Cross–Claims, which it later amended, against E & Y.[1] To briefly summarize, Cendant alleges that its former senior management caused the company's operating income to be inflated by approximately $500 million. (Am.Cross–Cl.¶ 13). It alleges that the "entire senior management of CUC, including but not limited to IRS former chairman and chief executive officer Walter Forbes, its former president Kirk Shelton, and two of its former chief financial officers, Stuart Bell and his successor Cosmo Corigliano" were involved in the illegal scheme. (*Id.* at ¶ 14). It states that the purpose of the fraud was to report sufficient income to meet Wall Street targets and to keep the price of the company's stock inflated. (*Id.* at ¶ 37.) According to the Cross Claims, CUC targeted HFS as a merger partner and victim of the fraudulent scheme. (*Id.* at ¶ 39). Cendant alleges that E & Y was either negligent in failing to discover the fraud or knowingly

1. E & Y has also asserted various cross-claims against Cendant and other defendants.

or recklessly facilitated it. It alleges E & Y participated in the fraud by creating false documents to reverse excess merger reserves into operating income. (*Id.* at ¶ 58).

Cendant avers that E & Y had a duty to report the information to board and audit committee members who were not involved in the fraud and could have ended it. (*Id.* at ¶ 29). It also claims that E & Y represented to HFS representatives in comfort letters and oral reassurances before the merger that CUC's financial statements were accurate. (*Id.* at ¶ 42). Cendant contends that E & Y's audits violated numerous generally accepted auditing standards. (*Id.* at ¶ 101). As a result of E & Y's actions, Cendant claims damages that include business and investment opportunities lost by HFS when it was induced to merge with CUC; millions of dollars in audit fees; damage to its reputation among Wall Street analysts and the public; legal fees and other expenses incurred in defense of investor and other lawsuits as well as criminal and SEC investigations; and liability in settlements of various lawsuits for over three billion dollars. (*Id.* at ¶ 105).

In its Amended Cross Claims, Cendant alleges common law fraud, negligence, and breach of contract on behalf of itself, as successor to HFS and as successor to CUC (Counts I VI; IX XI). It also alleges breach of fiduciary duty on behalf of itself and as successor to CUC (Counts VII and XII). Count VIII seeks contribution for liability incurred in settlement of the CalPERS action and potential future liability it may incur in other actions. E & Y moves to dismiss all of Cendant's Amended Cross Claims under the following theories:

- Cendant's claim for contribution (Count VIII), on the grounds that (1) section 11 does not allow contribution claims by settled defendants; and (2)

any claim for contribution is barred by the terms of the settlement bar provisions of the Private Securities Litigation Reform Act ("PSLRA");

- All state law claims, contending that these are "nothing more than a thinly-veiled attempt to obtain indemnity from E & Y, which is also barred by the PSLRA." (E & Y Br., at 2);

- Counts I–III, those brought as successor to HFS, because those claims belong to former HFS shareholders, and they have already been compensated in the Class settlement;

- All of the counts of the complaint that "sound in" negligence or malpractice (which it contends includes all state law claims), because Cendant has not complied with the New Jersey Affidavit of Merit statute, N.J. Stat. Ann. § 2A:53A–27;

- All of the breach of contract claims, because they fail to plead that Cendant performed all of its obligations under the contract; and

- Both breach of fiduciary claims, because public accounting firms do not have a fiduciary relationship with a public company.

### DISCUSSION

*Standard for Motion to Dismiss*

Under Fed.R.Civ.P. 12(b)(6), the Court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117, 127 (D.N.J.1999); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 (3d Cir.1994). The question is whether the claimant can prove any set of facts consistent with his allegations that will entitle him to relief, not whether that per-

son will ultimately prevail. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). While a court will accept well-plead allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *See Miree v. DeKalb County, Ga.,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977). Moreover, the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. *See* Fed. R.Civ.P. 8(a)(2); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The Court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. *See Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 259 (3d Cir.1998); *In re Cendant Corp. Derivative Action Litig.,* 189 F.R.D. at 127 *see also* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 at 299 (2d ed.1990).

*Analysis*

I. *Contribution and the PSLRA (Count VIII)*

Count VIII of the Amended Cross Claims alleges that E & Y is "responsible in substantial part for the injuries or damages alleged in the CalPERS action commenced against Cendant, because, among other things, E & Y intentionally misrepresented and concealed, or at a minimum failed to discover or recklessly disregarded, the accounting errors and irregularities that occurred for years in the financial statements of CUC prior to the merger and in CMS' 1997 financial statements." Amended Cross–Cl., ¶ 153. Cendant seeks

contribution "to the extent permitted by law" for E & Y's responsibility for the injuries and damages that led to the CALPERS settlement, "and for such other sums as Cendant may be obliged to pay in respect of liability to other claimants." *Id.* at ¶ 156.

Under the. PSLRA, a covered defendant "who settles any private action at any time before final verdict shall be discharged from all claims for contribution brought by other persons." 15 U.S.C. § 78u–4(f)(7). This Court entered a bar order when it approved the Cendant and E & Y settlements with the class. *See In re Cendant Corp. Sec. Litig.,* Judgment Approving Cendant Settlement (Skolnick Cert. at Ex. 4) ("Cendant Settlement Order"); August 14, 2000, at ¶ 10; Judgment Approving E & Y Settlement (Skolnick Cert. at Ex. 5) ("E & Y Settlement Order"), August 14, 2000 at ¶ 9. The bar order precludes contribution against a settled party and claims brought by a settled party. However, Cendant expressly reserved the right to assert cross-claims against E & Y (and other defendants) "otherwise permitted by any applicable federal or state statute or common law." Cendant Settlement Order, at ¶ 10.[2] E & Y claims that this contribution bar prevents Cendant from pursuit of any claim for contribution against E & Y. Cendant does not dispute that it may not seek contribution for its settlement of the Class's Section 10(b) claims under the PSLRA. However, Cendant asserts that it may recover contribution based upon Section 11 of the Securities Act of 1933, and that such a right to contribution is not barred by the PSLRA. E & Y claims that a settling party has no right to contribution under Section 11(f), but even if it did,

**2.** E & Y similarly reserved its rights to pursue its cross-claims against Cendant and other defendants to the extent otherwise permitted

by federal and state law. E & Y Settlement Order, at ¶ 9.

the PSLRA contribution bar would eliminate it.

### A. Right to Contribution Under Section 11(f)

■ The parties agree that Section 11 of the 1933 Act contains an express right to contribution:

> [E]very person *who becomes liable to make any payment* under this section may recover contribution as in cases of contract from any person who if sued separately, would have been liable to make the same payment, unless the person who has become liable was, and the other was not, guilty of fraudulent misrepresentation.

15 U.S.C. § 77k(f)(1) (emphasis added). E & Y, however, maintains that such contribution rights apply only to parties who have "become liable," which it asserts refers only to a party against whom a judgment has been rendered-that the "becomes liable" language does not apply to a party who has settled. Cendant responds that the Ninth Circuit has explicitly rejected this argument. In *Laventhol, Krekstein, Horwath & Horwath v. Horwitch*, 637 F.2d 672, 675–76 (9th Cir.1980), *cert. denied sub nom Frank v. U.S. Trust Co. of New York*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981), the Ninth Circuit reversed the grant of summary judgment of non-settled defendants' cross-claims for contribution against settled defendants because it found that settled defendants may be liable to non-settled defendants for contribution for Section 11 claims. *Id.* That Circuit also rejected the settled defendants' arguments that to allow contribution in such a case would discourage settlements:

> [T]he statute is silent as to the encouragement of settlements. Moreover, contribution strengthens the policy underlying the securities laws. As between the culpable parties, contribution reinforces the deterrent effect of the statute by

preventing one wrongdoer from unjustly escaping loss by shifting its responsibility to another wrongdoer for the same payment. Each party liable for the same payment must pay its proper share of that payment. Equally important, contribution gives the injured investor an extra measure of protection by broadening its potential source of reimbursement for damages.

*Id.* at 675. E & Y responds that only non-settled defendants in *Laventhol* sought contribution, and that case accordingly did not determine whether a settled defendant "becomes liable" under Section 11. E & Y is correct: *Laventhol* did not address whether a settled defendant could "become liable" for purposes of § 77k(f)(1).

E & Y also relies upon a footnote in a Northern District of California case, *Nelson v. Quimby Island Reclamation District Facilities Corp.*, which suggested that the language of the statute implies that a right to contribution "accrues after a judgment is rendered." No. C–77–0784, No. C–80–0477, 1980 WL 1405, at *2 (N.D.Cal. 1980). This analysis was in the context of its determination of whether the claim for contribution was timely under California's one-year statute of limitations for contribution actions. The Court relied upon the Restatement (Second) of Torts, which allows a claim for contribution only for a "tortfeasor who has discharged the entire claim for harm by paying *more than his equitable share of the common liability.*" *Id.* at *5, quoting Rest. (Second) Torts § 886A (1979). However, *Nelson* did not deal directly with whether a settled party had "become liable."

Cendant also cites *In re Del–Val Financial Corp. Sec. Litig.*, 868 F.Supp. 547, 553–54 (S.D.N.Y.1994), which found that a settled defendant could maintain a Section 11 contribution claim against an accounting firm that had audited the financial statements alleged to be misleading. There

Deloitte & Touche ("D & T") moved to dismiss settled defendants cross-claims against it. Although D & T did not expressly argue that the settled defendants had not "become liable," it did argue that they could not be joint tortfeasors because they had settled and explicitly denied liability to the plaintiffs. *Id.* at 553. The district court rejected this contention because "*[a] party need not actually be adjudged liable to the injured party to be a joint tortfeasor. ... All that is required are 'allegations that the defendant and third-party defendant were joint participants in the fraud alleged by plaintiff.'*" *Id.* It explained:

> Settling Defendants have certainly made allegations that, if proven, would establish that Settling Defendants and D & T, their independent auditor, were jointly involved in causing injury to Plaintiffs. These allegations are sufficient to support Settling Defendants' crossclaims for contribution of Plaintiffs' federal securities claims.

*Id.* (citation omitted). Under this analysis, so long as it is possible to determine that Cendant has paid more than its equitable share of common liability under the settlement and that Cendant and E & Y were joint tortfeasors, Cendant need not have had a judgment rendered against it to maintain its claims for contribution under Section 11 because it has "become liable" under the settlement.[3] The allegations are sufficient to state that E & Y and Cendant are joint tortfeasors. This Court finds

that a defendant need not have a judgment rendered against it for that defendant to seek contribution under § 77k(f)(1).

Even if Section 11 affords a settled defendant a right of contribution, the Court must determine whether the "contribution bar" provision of the Private Securities Litigation Reform Act ("PSLRA") nevertheless would preclude such an action.

**B. *PSLRA's Contribution Bar.***

■ Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67,

> A *covered person* who settles any private action at any time before final verdict or judgment shall be discharged from all claims for contribution brought by other persons. Upon entry of the settlement by the court, the court shall enter a bar order constituting the final discharge of all obligations to the plaintiff of the settling covered person arising out of the action. *The order shall bar all future claims for contribution arising out of the action—*
>
> (i) by any person *against the settling covered person;* and
>
> (ii) by the *settling covered person against any person,* other than a person whose liability has been extinguished by the settlement of the settling covered person.

15 U.S.C. § 78u–4(f)(7)(A) (emphasis added). The Act defines a "covered person" as

---

**3.** E & Y further counters that in its approval of the settlement, this Court has already determined that E & Y and Cendant were paying their proportionately fair share of the settlement. Cendant disagrees based upon the settlement agreement's explicit recognition that Cendant might still recover from E & Y, and its allowance of 50% of any such future recovery to be paid to the Class. This was a factor this Court considered meaningful in its assessment of the fairness of the settlements. *See In re Cendant Corp. Sec. Litig.,*

109 F.Supp.2d 235, 256 (D.N.J.2000); *In re Cendant Corp. Sec. Litig.,* 109 F.Supp.2d 273, 277 n. 2 (D.N.J.2000). E & Y protests that the Court never made any evaluation of the value of potential recovery against E & Y. The Court actually made no determination one way or the other as to whether Cendant and E & Y were contributing their equitable share to the settlement; it merely approved the settlement which provided Cendant a right to recover against E & Y to the extent permitted by federal and state law.

(i) a defendant in any private action arising under this chapter [the Securities Exchange Act of 1934]; or

(ii) a defendant in any private action arising under section 77k of this title [section 11 of the Securities Act], who is an *outside director of the issuer* of the securities that are the subject of the action.

15 U.S.C. § 78u–4(f)(10)(C) (emphasis added).

Cendant argues that the contribution bar does not apply to actions for contribution to recover amounts paid to settle a Section 11 claim because the PSLRA contribution bar "applies by its terms only to claims for contribution based on liability under the Exchange Act (such as Rule 10b–5 claims) or to claims under section 11 against outside directors." Cendant Br. at 6. It argues it is not a covered person because only outside directors in Section 11 claims are "covered persons." *Id.*

E & Y relies upon *Lucas v. Hackett Associates, Inc.,* 18 F.Supp.2d 531 (E.D.Pa.1998). There the plaintiffs filed a lawsuit against several defendants, which alleged a Section 10(b) claim and a variety of state law tort and contract claims, including fraudulent misrepresentation and misappropriation of investment funds, that arose out of the allegedly fraudulent sale of viatical settlements.[4] 18 F.Supp.2d at 533–34. After defendants impleaded plaintiffs' attorney, plaintiffs filed claims against the attorney for breach of an escrow agreement, breach of a specific term of the legal representation agreement and legal malpractice. *Id.* at 533. Certain defendants settled and sought the entry of a bar order that would preclude the non-settling defendants from pursuit of any contribution or indemnity claims against the settled defendants. *Id.* at 533–534. The district court denied the specific settlement bar order requested on two grounds: (1) that it required an adjudication of joint tortfeasor status on the part of the settling defendants before a reduction in the award would be allowed; and (2) that it would bar all indemnity claims, even those premised on non-securities state law claims. *Id.* at 534–536. However, the Court indicated it would approve an order "which, for purposes of any contribution claim, the settling defendants will be treated as joint tortfeasors...." *Id.* at 537. It held that claims for contribution that arose out of the plaintiffs' state law tort claims would be barred by because they were "integrally related to the securities transaction" and thus "ar[o]se out of the [securities] action." *Id.* at 534–35.[5] E & Y argues that the "integrally related" analysis should apply equally to claims for contribution under Section 11 of the Securities Act. Because here, plaintiffs' section 11 claim was "integrally related" to the 10(b) claim, E & Y urges that the section 11 contribution claim is barred by the PSLRA. E & Y Br. at 10. Although Cendant protests that the *Lucas* court specifically addressed only the state law claims for contribution, not any claims under Section 11, that does not persuade this Court that the phrase "all future claims for contribution arising out of the action" does not apply to Section 11 claims as well. *Id.* at 534–35.

E & Y contends that it is a "covered person" under the PSLRA contribution bar because it was a defendant in an action under the 1934 Act. To iterate, because plaintiffs' complaint contained Section

---

4. A "viatical settlement" is a life insurance policy sold by a terminally ill patient for less than its full value in order to receive a cash payment before his or her death. *Lucas,* 18 F.Supp.2d at 532.

5. The court did not say which claims would be barred as "integrally related" to the securities claims.

10(b) claims against it, it is a covered person under § 78u–4(f)(7)(A)(i). That it does not happen to fall within the second possible definition of "covered person" provided in § 78u–4(f)(7)(A)(ii) does not prevent it from being a covered person under the first definition. Because the Section 11 claims against it arose out of the same action as the Section 10(b) claims against it, E & Y is still a covered person under the contribution bar.

Cendant argues that E & Y's reading of *Lucas* stretches its holding because it held only that pendent state law claims would be barred by the PSLRA. However, it maintains, Congress explicitly decided that section 11(f) contribution claims are not barred unless they are made by an outside director.

Cendant's interpretation of the plain language of the PSLRA is too narrow. By its language, the bar applies to prohibit *all future claims for contribution arising out of the action*—against a settling covered person. Cendant tries to avoid this inevitability by reference to the definition of "covered person" in isolation. One may be a covered person under the PSLRA if one was a defendant in an action under the '34 Act (including Section 10(b) claims). That E & Y is not also a covered person under Section 78u–4(f)(7)(ii) does not mean that it

is not a covered person under Section 78u–4(f)(7)(i). *Lucas* held that to the extent a claim is "integrally related" to the securities claim settled, all contribution claims that arise out of that action are barred. Although it only considered related state law claims, its rationale does not prevent one federal securities claim from being integrally related to another. Nor does Cendant deny that the Section 11 claim is "integrally related" to the Section 10(b) claim. The two claims arise out of practically the exact same factual environment and require nearly identical proofs. That (1) defendants' Section 11 liability to plaintiffs would have been limited only to those statements made in connection with a prospectus or registration statement and (2) Section 10(b) requires proof of scienter do not prevent the claims from being "integrally related." [6]

E & Y's motion to dismiss Cendant's Count VIII for contribution is granted, to the extent that Cendant seeks contribution for payments attributable to the Section 11 claims.[7]

## II. *Indemnity/State Law Claims (Counts I–VII; IX–XII)*

 E & Y moves to dismiss all. of E & Y's state law claims on the ground that they are essentially claims for indemnifica-

---

**6.** E & Y argues that the PSLRA bar was meant to allow defendants to buy "complete peace" and to codify an existing practice, under which bar orders were routinely entered to preclude all federal contribution claims. *Id.* It cites *Eichenholtz v. Brennan,* 52 F.3d 478, 486–87 (3d Cir.1995) and *Alvarado Partners, L.P. v. Mehta,* 723 F.Supp. 540, 550 (D.Colo.1989). These cases, says E & Y, explain that when parties settle, they bear the risk that they settled either too high or too low; thus settling parties may not seek contribution from each other. E & Y Br. at 11. Cendant responds that this federal common law was replaced by an explicit provision that limits the contribution bar only to outside directors in Section 11 cases. As already

stated, the Court does not read the PSLRA language this narrowly.

**7.** E & Y also insists that the result urged by Cendant would be impracticable because it would be impossible to determine the relative proportion of the settlement that accounts for Section 11 claims versus Section 10(b) claims. Because the Court determines that the PSLRA bars all contribution claims that arise out of the Section 10(b) action, it does not consider whether a finder of fact would be able to allocate the settlement amounts between those that are attributable to Section 10(b) and those that resulted from Section 11 claims.

tion. These claims include: Three counts of breach of contract (III, V and X); three counts of negligence (Counts II, VI, and XI); three counts of fraud (Counts I, IV and IX); and two counts of breach of fiduciary duty (Counts VII and XII). Indemnification, it argues, is contrary to the PSLRA settlement bar and the "long-recognized policy against indemnification for federal securities fraud claims." E & Y Br. at 12. E & Y refers to a number of cases that hold that there is no right to indemnification under Section 11. *Lucas*, 18 F.Supp.2d at 535; *U.S. Oil and Gas Litig.*, 967 F.2d 489 (11th Cir.1992); *Alvarado Partners, L.P.*, 723 F.Supp. at 553. *See also Laventhol*, 637 F.2d at 676. *Eichenholtz* refused to imply a right to contribution under Section 11 because to allow indemnification for Section 11 liability would weaken the deterrent effect—to encourage diligence and discourage negligence in securities transactions—that Congress had intended. *Id.* at 484–485. Cendant does not dispute the basic principle that there is no right, express or implied, to indemnification for Section 11 liability under the federal securities laws. However, Cendant maintains that its state law claims are not claims for indemnification which would be barred by federal securities laws but are independent state law claims. Nevertheless, E & Y contends that this Court should construe all of Cendant's claims as "integrally related" to the securities claims and thus barred by the bar order this Court entered. *See* E & Y Br., at 13–14. E & Y requests application of the PSRLA to "claims for indemnification of the amount paid in settlement," because the purpose to encourage settlement would be inhibited if defendants were allowed to seek indemnity from public accounting firms. The Court rejects E & Y's argument that all state law claims that are integrally related to a federal securities claim are barred as improper indemnity claims. *Lucas'* use of

the "integrally related" language was limited to its discussion of contribution claims. *Lucas* itself recognized that contribution and indemnity claims are different:

There is ... a fundamental difference between indemnity and contribution. The right of indemnity rests upon a difference between the primary and secondary liability of two persons each of whom is made responsible by the law to an injured party. It is a right which [i]nures to a person who, *without active fault on his own part, has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another and for which he himself is only secondarily liable.*

18 F.Supp.2d at 535, quoting *Builders Supply Co. v. McCabe*, 366 Pa. 322, 77 A.2d 368, 370–71 (Pa.1951). Thus the thrust of indemnification is a secondary level of liability. Contribution, by contrast, is the right of one tortfeasor to recover from another tortfeasor when both are liable to a victim and one has paid more than his or her equitable share of the common liability. *See* Rest. (Second) Torts § 886A (1979).

E & Y references the second holding in *Lucas*, which concluded that any indemnification claim "premised on violations of federal securities laws-whether those violations are clothed as state law tort claims or federal law securities claims," is preempted. E & Y Br., quoting 18 F.Supp.2d at 535. However, this conclusion was not determinative of the state law claims in that case. Rather, *Lucas* recognized that some state law claims might be preempted, but only to the extent those state claims were essentially claims for indemnification under the securities laws. *Id.* at 536–37. The only explicit example it gave of a state law claim that would be preempted because it was really

an indemnity claim "clothed" as a state claim was a subrogation claim. *Id.* Otherwise, the court explained that it did not determine which of plaintiff's state law claims were preempted:

> If ... plaintiffs['] state law claims are *sufficiently independent* of the federal securities *claims—although admittedly related to them as they "arise out of" the federal claims*—this Court will not bar [defendant's] right to seek indemnity under state law.... The Court is not prepared to decide, at this juncture, to what extent [defendant's] potential claims for indemnity are or are not "de facto" federal securities claims....

*Id.* at 536 (emphasis added), citing *In re Sunrise Securities Litig.*, 793 F.Supp. 1306, 1321 (E.D.Pa.1992). *Lucas* did not rely upon the PSLRA's contribution bar in its analysis of the "indemnity" claims. *In re Sunrise Securities Litig.* involved a challenge to the viability of state law tort and breach of contract claims by co-defendants against a law firm that had represented a failed savings & loan after the law firm had settled. 793 F.Supp. at 1321. There the District of Pennsylvania held:

> The damages that the non-settling defendants seek for their tort and contract claims are similar, although not identical, to the damages that they seek for their indemnification claims. Such an overlap does not necessarily transform the claims into claims for implied indemnity. .... Because I conclude that the state law claims alleged by the non-settling defendants are not *de facto* indemnity claims, they are not preempted by federal law.

*Id.*

In *Laventhol* the Third Circuit observed that cross-claims for indemnity for alleged violations of the Securities Act of 1933 were properly dismissed by the district court. 637 F.2d at 676. However, it nevertheless acknowledged that the appellants' state claims for indemnity based upon negligent failure to investigate and discover fraud and breach of fiduciary duty could be recognized, depending on which state's law was to be applied below and the resolution of unresolved factual issues as to the relationship between the parties. *See id.* In *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982), an accounting firm settled a shareholder suit and brought claims for fraud and breach of contract against its client, Cenco, for damages paid to shareholders in the underlying action. Judge Posner allowed the state law claims to proceed, because they were premised on independent duties that Cenco had owed to the plaintiff and were not impermissible indemnification claims in disguise. *Id.* at 457–58. After remand, the district court observed the distinction between recovery under principles of contribution or indemnity versus ordinary, direct tort liability:

> Recovery by indemnity between two defendants who have allegedly committed a tort on a third person is not the same thing as recovering because one defendant also committed a tort on the other.... The gist of Seidman's fraud claim is not that it is more equitable that Cenco pay for Seidman's loss to the class, but that Cenco *has committed a tort to Seidman, and must pay damages for this, damages which happen to encompass the settlement payment.* That this element of damages overlaps what Seidman maybe could have recovered through indemnity does not make it indemnity.

*In re Cenco Securities Litig.*, 642 F.Supp. 539, 541–42 (N.D.Ill.1986) (emphasis added).[8] See also, *In re Cendant Corp. Sec.*

---

**8.** This decision affirmed an interim opinion from 1984 in which the district court dis-

*Litig.*, 109 F.Supp.2d at 283 ("*Independent non-contribution claims against settling defendants, however, are not subject to [a contribution] bar.*") (emphasis added).

*Cenco's* reasoning is persuasive: merely because Cendant's tort and contract claims seek to recover damages that could be recoverable in a state law indemnity action do not convert these claims into impermissible indemnity claims under the federal securities laws. Rather, they are independent, non-indemnity claims that are neither barred nor preempted by the federal securities laws. Even *Lucas,* which addressed the contribution bar, did not find that independent state law claims would be barred.

E & Y also advances *In re U.S. Oil and Gas Litig.,* 967 F.2d 489 (11th Cir.1992). There the Eleventh Circuit held that the district court had properly barred all indemnity claims, however described—including fraud and negligence claims, that sought to recover amounts paid in settlement and that were "integrally related" to the claims that had been settled. *Id.* at 496. However, *Oil and Gas Litig.* involved state law claims to recover damages only to the extent the settled defendant was liable to the plaintiffs in the original action. More important, *Oil and Gas* was a pre-PSLRA case in which the Court decided to approve a contribution bar which was broader than the current PSLRA language. Consequently, that result is not inconsistent with *Lucas, In re Sunrise* and *Laventhol:* to the extent claims are "integrally related" with the securities claims that were settled, they would be held to be preempted by the federal securities laws. But, as discussed, under the PSLRA and *Lucas,* not all state law claims are required to be barred.

As in *Lucas, In re Sunrise* and *Laventhol,* the state law cross-claims here are based upon independent breaches of duty that E & Y owed to Cendant, CUC and HFS as third-party beneficiary. Although some of the damages sought might overlap with the damages for which Cendant was liable to the class under the settlement, they are for independent torts and breach of contract. Nor does Cendant attempt to use these claims to shift its entire liability under the settlement. Cendant's state law cross claims for negligence, fraud, breach of contract and breach of fiduciary duty are not barred as *de facto* securities claims.

■ E & Y also seeks dismissal of Cendant's state law claims because, under *Cenco,* a company may not shift all liability for fraud to its outside accountant when the fraud permeates the top management of the company. In *Cenco,* the Seventh Circuit upheld a verdict against a company which had sought to recover amounts it paid to settle federal securities fraud claims from its outside accounting firm under theories of breach of contract, negligence and fraud. Cenco had admitted that its senior officers were involved in the fraud that inflated the market price of Cenco's stock. After new management disclosed the fraud, the company's stock dropped by 75%. Investors brought a class action against Cenco and the auditors for violation of securities laws and fraud; Cenco filed cross-claims against the auditors for breach of contract, professional malpractice and fraud. The jury rendered a verdict for the auditors on Cenco's cross-claims, and Cenco appealed. On appeal, it argued that the jury had been improperly instructed that the acts of a corporation's employees were the acts of the corporation

missed Seidman's cross-claim on the basis of lack of subject matter jurisdiction. 642

F.Supp. at 543.

itself if the employees were acting on the corporation's behalf. The Seventh Circuit determined that when "fraud permeated the top management of the company," and the fraud was not against the company but rather on behalf of the company, it was unclear how Illinois would resolve the issue of auditors' liability. *Id.* at 454. Instead, the Circuit looked to the "underlying objectives of tort liability," which were to "compensate the victims of wrongdoing and to deter future wrongdoing." *Id.* Based upon those principles, the court found that fraud would not be deterred more effectively if a corporation could "shift the entire cost of the fraud from itself ... to the independent auditor who failed to prevent the fraud." *Id.* Because that court determined that the corporation should not be entitled to shift the entire responsibility of fraud to its auditors, it held the challenged jury instruction proper. *Id.* at 456.

E & Y seeks to have that holding apply here. It argues that because a corporation is a legal fiction, any compensation recovered against E & Y would benefit the stockholders who have already recovered under the Class settlement. It avers that "it seems odd that the same shareholders should be able to recover damages from [the auditors] twice for the same wrong— once directly and once, ... indirectly." E & Y Br., at 17, quoting *Cenco,* 686 F.2d at 455.

Cendant responds that because the decision was rendered with the Illinois contributory negligence rule in mind, which would have shifted responsibility in its entirety, this rule should not apply to this case because both Connecticut and New Jersey (the two states whose laws might apply) apply principles of comparative fault. Cendant Br., at 13. Cendant also points to a tort principle of New Jersey law that a professional hired to safeguard a client from self-inflicted harm who fails to pre-vent that harm due to malpractice cannot defend itself by pointing to the fault of its client. *See id.,* citing *Conklin v. Hannoch Weisman,* 145 N.J. 395, 412, 678 A.2d 1060 (1996).

Cendant further reminds the Court that although Judge Posner concluded that auditors do not have a duty to "ferret out fraud," that concept has changed significantly since that case was decided in 1982. Specifically, the PSLRA imposes stricter duties on auditors to detect and report fraud, and new statements on auditing standards ("SASs") have been promulgated. *See* 15 U.S.C. § 78j–1(b)(3) (auditor has affirmative obligation to report fraud to SEC if the audited company does not); SAS 82 (auditor has duty to inform management of misstatements); AICPA Codification of Statements on Auditing Standards, AU 316.38 (2000). Finally, Cendant contends that it would be unfair to impute the fraud perpetrated by CUC managers to Cendant to avoid E & Y's liability for its own wrongdoing. Cendant Br., at 14. Cendant cites *Battenfeld v. Baird, Kurtz & Dobson,* in which a district court refused to impute such fraudulent actions to the surviving company of a merger. 60 F.Supp.2d 1189, 1217–18 (D.Kan.1999). *Battenfeld* held that the surviving corporation was a victim of the fraud of the original corporation because the actions of the individual who had painted a false financial picture were adverse to the interests of the company. *Id.* at 1218.

Especially given the recent changes in accounting standards and the increased duties of auditors to report misstatements both to the SEC and to management, *Cenco's* concern that a company guilty of fraud might be able to shift liability in its entirety does not apply. Even if Cendant were to prevail, it would only be able to shift the portion of the damages ultimately found to be attributable to E & Y, not the entire

amount and thus would not be unfair as in a full *Cenco* scenario. As in *Battenfeld*, although the individuals who allegedly committed the fraud painted a false financial picture of the company with the intent to benefit the company, these actions were ultimately against the best interests of the company and should not be imputed to prevent Cendant from recovery against a separate, alleged wrongdoer, E & Y. This motion is denied.

### III. *Successor to HFS Claims (Counts I–III)*

■ E & Y moves for dismissal of Counts I III for common law fraud, negligence, and breach of contract, respectively—those brought by Cendant as successor to HFS, because (1) Cendant lacks standing to bring these claims; and (2) those claims would allow former HFS shareholders double recovery. Instead, says E & Y, claims for fraudulent inducement to merge with CUC belong to the former HFS shareholders and not to Cendant. *See* E & Y Br., at 19.

As both parties recognize, when HFS merged with CUC, Cendant succeeded to the rights and liabilities of HFS under Delaware law. 8 Del.Code Ann. § 259(a). E & Y argues that Cendant may only sue as successor to HFS if HFS owned the claims before the merger. E & Y also says that the HFS shareholders owned those claims and filed them against E & Y in the Class action, which already settled. E & Y BR. at 19. The parties focus on the distinction between derivative and direct shareholder actions:

> *Generally speaking, a wrong to the incorporated group as a whole that depletes or destroys corporate assets and reduces the value of the corporation's stock gives rise to a derivative action;* a breach of an individual shareholder's 'membership' contract or some other interference with the rights that are traditionally viewed as incident to the individual's ownership of stock gives rise to a non-derivative, or direct, action by the injured shareholder or shareholders.

E & Y Br., quoting *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1188 n. 10 (Del. 1988). Cendant agrees—it states that a claim that involves a reduction in corporate assets are owned by the corporation.

To determine whether the claim belongs to the company or to the shareholders directly, the court considers the "nature of the wrong alleged" and "the relief, if any, which could result if plaintiff were to prevail." *Kramer v. Western Pacific Indus., Inc.*, 546 A.2d 348, 350 (Del.1988). An individual claim is proper when the shareholder is "injured directly or independently of the corporation." *Id.* at 351. Both E & Y and Cendant characterize Cendant's claims in Counts I–III as primarily claims for lost opportunity damages. E & Y, however, insists that such claims are "necessarily subsumed within the claims the HFS shareholders have already made against E & Y." E & Y Br. at 21. Because the HFS shareholders have already settled a suit which supposedly compensated them for the value of foregone opportunities, E & Y believes that the shareholders have already been compensated for the losses asserted in these three counts.

E & Y contends that direct attacks " 'against a given corporate transaction (attacks involving fair dealing or fair price)', including claims of fraudulent inducement of a merger, belong to the shareholders because it is their individual ownership rights that were directly impacted by the alleged wrongdoing." E & Y Br. at 20, quoting *Kramer*, 546 A.2d at 354. Cendant responds that courts have found corporations to be the rightful owners of claims for deprivation of possible business or investment opportunities. Cendant's claims do not challenge the decision to approve the merger; rather they

claim that had HFS known then what it knows now, it would never have approved the merger. As a result, HFS itself, not its shareholders, lost the benefit of "other profitable business and investment opportunities." Amended Cross–Cl., at ¶ 105. Although E & Y attempts to re-characterize Cendant's claim as one that the stockholders of HFS were fraudulently induced to give up their ownership rights, *see* E & Y Reply, at 9, that is not what Cendant claims. It claims that the value of the corporation suffered as a result of lost business opportunities. This is undoubtedly a claim that belongs to the corporation. Apparently, E & Y misses the point because, as it admits, the inquiry focuses on the nature of the harm alleged, not the cause of action. One district court in this Circuit has observed:

> Where the defendant's wrongdoing has *caused direct damage to corporate worth, the cause of action accrues to the corporation, not to the shareholders, even though in an economic sense real harm may well be sustained by the shareholders* as a result of reduced earnings, diminution in the value of ownership, or accumulation of personal debt and liabilities from the company's financial decline. The personal loss and liability sustained by the shareholder is both *duplicative and indirect* to the corporation's right of action.

*In re Phar–Mor, Inc. Sec. Litig.*, 900 F.Supp. 777, 781 (W.D.Pa.), quoting *Adair v. Wozniak*, 23 Ohio St.3d 174, 492 N.E.2d 426, 429 (1986). The claim for lost business opportunities can be fairly characterized as one for "direct damage to the corporate worth" and is owned by the corporation. E & Y's observation that it would be "odd" to allow the shareholders recover twice for the same damages is misplaced. That the shareholders may have already been compensated by the company and by E & Y does not lessen the harm to the corporation. Similarly, even if

the shareholders receive a "duplicative and indirect" benefit, that does not eliminate the corporation's right to recovery.

Cendant also denies the significance of shareholder approval of the merger between CUC and HFS in determining who owns the claims, because other courts have found claims to belong to the corporation even when shareholders approved the complained-of conduct. Cendant Br., at 17, citing *Kramer*, 546 A.2d at 353–54. *Kramer* held that when a shareholder claimed that the value of his stock would deteriorate and his proportionate share of stock would decrease as a result of alleged director mismanagement, that cause of action was *derivative* in nature. 546 A.2d at 353. In other words, the cause of action was one that belonged to the corporation, not the individual shareholder.

E & Y further insists that it would not make sense to allow Cendant to recover for HFS's loss of opportunities because CUC was involved in the fraud and former CUC shareholders would benefit. *See* E & Y Br. at 21. It alleges that CUC shareholders actually benefitted from the merger because the company received valuable assets and they received more than they would have received had the true value of the stock been revealed. *Id.* at 22. Cendant responds that recovery "inures to the benefit of the corporation" and any benefit to shareholders is indirect. Cendant Br. at 18. Moreover, it asserts, courts regularly award recovery to corporations despite the wrongdoing of some shareholders. *See Associated Imports, Inc. v. ASG Indus., Inc.*, Civ. A. No. 5953, 1980 WL 6784, *3 (Del.Ch.1980) (shareholder suit is one brought for the benefit of the corporation "and thus one in which all shareholders, whether guilty or innocent of the wrongs complained of, share indirectly."). Again E & Y does not consider the proper inquiry into the nature of the harm al-

leged. The Court agrees with Cendant that the shareholders' approval of the merger is irrelevant and does not deprive the corporation of standing. The conduct "complained of" is not the approval of the merger but the failure of E & Y to bring material information to the attention of management and others in preparation for the merger. The harm from lost opportunities is a direct harm to the corporation for which the corporation may recover, notwithstanding any indirect benefit to the shareholders.

Finally, E & Y suggests that to allow claims as successor to HFS would give a "windfall" to Cendant shareholders who purchased stock after the accounting fraud was revealed, because they bought with knowledge of the fraud and at a price that was adjusted to reflect the reduction in potential business opportunities. E & Y Br. at 22. E & Y cites *Bangor Punta Operations, Inc. v. Bangor & Aroostock R.R.*, 417 U.S. 703, 715–16, 94 S.Ct. 2578, 41 L.Ed.2d 418. Cendant replies this case is inapplicable because it merely applied to federal causes of action the equitable rule that one who purchases all or substantially all of a corporation's stock at a fair price cannot sue its seller for previous corporate mismanagement. Cendant Br., at 19 n. 3. Furthermore, it refers this court to *Overfield v. Pennroad Corp.*, 48 F.Supp. 1008, 1018 (E.D.Pa.1943), *aff'd*, 146 F.2d 889 (3d Cir.1944). There the defendant had argued that the corporation's damages should have been limited to shareholders at the time of the transactions at issue. The court rejected that argument and held that the recovery would go to the whole corporation notwithstanding any indirect benefit to those who were not shareholders at the time of the alleged wrongdoing. *Id.* This Court follows the approach in *Overfield.* E & Y's motion to dismiss the claims brought as successor to HFS is denied.

IV. *"Negligence"/ "Malpractice" Claims and the Affidavit of Merit Statute (I–VII; IX–XII)*

E & Y seeks dismissal of Cendant's negligence claims and any claims that can be construed as malpractice claims because of Cendant's failure to comply with the New Jersey Affidavit of Merit statute, N.J. Stat. Ann. § 2A:53A–27. The Affidavit of Merit Statute requires that in any action for

> damages for ... property damage resulting from an alleged act of malpractice of negligence by a licensed person in his profession or occupation, the plaintiff shall, within 60 days following the date of filing of the answer to the complaint by the defendant, provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the ... work that is the subject of the complaint, fell outside acceptable professional or occupational standards....

N.J.S.A. § 2A:53A–27. Failure to comply with this statute when required is "deemed a failure to state a cause of action." N.J.S.A. § 2A:53A–29. E & Y argues that because E & Y filed its answer to the original Cross Claims on March 24, 1999, Cendant should have filed an "affidavit of merit" by a licensed accounting professional by May 24, 1999 but failed to do so. E & Y Br. at 23. E & Y seeks dismissal of not only the claims termed "negligence" but also all counts premised on state law, because its believes the theories of breach of contract, breach of fiduciary duty and fraud are "in reality, claims for malpractice." *Id.* at 24. It relies upon *Cenco*, which observed—in the context of its analysis of whether the district court's instructions that the auditors could not recover against the company if it was a participant in any wrongdoing—that such theories

"are a single form of wrongdoing under different names" when committed by auditors. 686 F.2d at 453.

Cendant answers that the Affidavit of Merit Statute does not apply at all because it is a substantive statute, and under a choice-of-law analysis, the substantive law of Connecticut, and not New Jersey, will apply. E & Y replies that even if the statute is "outcome determinative" for purposes of *Erie* analysis, it may still be "procedural" for choice-of-law purposes and refers to the New Jersey choice of law principle that the procedural law of the forum state applies even when a different state's substantive law must govern. It also maintains that if the statute is considered substantive for choice of law analysis, the statute would still apply because New Jersey's law will more likely apply than Connecticut law. E & Y Reply, at 12. Because this Court agrees with Cendant that the Affidavit of Merit statute is inapplicable, it need not address Cendant's other arguments why its state law claims are not barred by the statute.[9]

### A. *Substantive v. Procedural Rule*

■ In *Chamberlain v. Giampapa*, the Third Circuit determined under an *Erie* doctrine analysis that the New Jersey Affidavit of Merit Statute is a "substantive state law" that should be applied by courts who sit in diversity. 210 F.3d 154, 161 (3d Cir.2000). Nevertheless, E & Y argues that New Jersey courts have considered the statute *both* substantive and procedural and cites the choice of law principle that "the procedural law of the forum state applies even when a different state's substantive law must govern." *North Bergen Rex Transport, Inc. v. Trailer Leasing*

*Co.*, 158 N.J. 561, 730 A.2d 843, 848 (1999). Thus, even if Connecticut substantive law might apply, E & Y would have this Court apply the New Jersey Affidavit of Merit statute because it is "procedural."

The cases cited by E & Y to support its position that the law is procedural are unpersuasive. Although New Jersey courts have commented that the rule is both procedural and substantive, that characterization was not in the context of a choice of law analysis. *See Alan J. Cornblatt, P.A. v. Barow*, 153 N.J. 218, 246, 708 A.2d 401, 415 (1998) (holding that because the statute has both substantive and procedural requirements, dismissal for failure to comply with the procedural requirements should be with prejudice absent extraordinary circumstances); *Palanque v. Lambert–Woolley*, 327 N.J.Super. 158, 742 A.2d 1002, 1005 (App.Div.2000) (same). On the other hand, even though *Chamberlain's* characterization of the law was part of its *Erie* analysis, that discussion provides guidance: It was found to be outcome determinative, and hence substantive, because "the required affidavit is not a pleading, is not filed until after the pleadings are closed, and does not contain a statement of the factual basis for the claim. Its purpose is not to give notice of the plaintiff's claim, but rather to assure that the malpractice claims for which there is no expert support will be terminated at an early stage in the proceedings." 210 F.3d at 160. This Court also finds guidance in the legislative history of the statute. It was passed as part of a package of five tort reform bills to " 'bring common sense and equity to the state's civil litigation system.' " *Cornblatt*, 153 N.J. at 228, 708 A.2d 401, quoting Office of the Governor,

---

9. Cendant's other arguments include (1) that E & Y is not a "licensed person" within the meaning of the statute; (2) that "exceptional circumstances" exist which render a dismissal with prejudice under the statute inequita-

ble; and (3) the Affidavit of Merit Statute would not apply in any event to Cendant's cross-claims for fraud, breach of contract or breach of fiduciary duty because they are not fairly characterized as malpractice claims.

News Release 1 (June 29, 1995). The overall purpose of the statute is " 'to require plaintiffs in malpractice cases to make a threshold showing that their claim is meritorious, in order that meritless lawsuits readily could be identified at an early stage of litigation.' " *Martin v. Perinni Corp.*, 37 F.Supp.2d 362, 364 (D.N.J.1999), quoting *In re Petition of Hall*, 147 N.J. at 391, 688 A.2d 81; *Cornblatt*, 153 N.J. at 242, 708 A.2d 401. Because the primary aim of the statute is to provide courts with a preview of the expert evidence that will support the merits of the claim, this Court regards this statute as substantive for choice of law purposes. At least one commentator has suggested that in this context, for a choice of law analysis, the statute ought to be regarded as substantive. *See* Jeffrey A. Parness, Amy M. Leonetti, & Austin W. Bartlett, *The Substantive Elements in the New Special Pleading Laws*, 78 Neb. L.Rev. 412, at 441–42 (1999) ("[A] designated "pleading" law found within a statutory section on torts, which was enacted as part of a tort reform package and has withstood a separation of powers challenge, *should normally be viewed as substantive for choice of law purposes.... Functions rather than labels are often key.*") (emphasis added). This Court agrees.

### B. *Choice of Law Analysis*

■ Cendant avers that the cross-claims allege that the "malpractice" was ... committed in audits managed and conducted by accountants working in and under the supervision of E & Y's Stamford, Connecticut office, where CUC was E & Y's largest client (Amended Cross–Claims 15). The only companies E & Y audited, CUC and CMS, were headquartered in Connecticut and all of their relevant executive officers worked there. E & Y prepared, signed and issued the false audit opinions in Connecticut. Cendant has no reason to believe, and nowhere alleges, that E & Y's annual audit, review, and other work for its Connecticut-based client was ever performed in New Jersey or by New Jersey licensed accountants.

Cendant Br., at 21–22. E & Y contests this and points to the Venue section of the Amended Cross–Claims, which asserts venue is proper in this District because "a substantial part of the events and omissions giving rise to Cendant's cross-claims occurred in this judicial district," and because the claims are so related to the cross-claim based upon contribution under the securities laws that they arise out of the same case or controversy. E & Y Reply, at 12; Amended Cross–Cl., ¶ 7.

In exercise of supplemental jurisdiction over Cendant's state law claims, this Court must apply state substantive law. *See Boody v. Twp. of Cherry Hill*, 997 F.Supp. 562, 569 (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). This includes the state's choice of law provisions. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Henry v. Richardson–Merrell, Inc.*, 508 F.2d 28, 31 (3d Cir.1975). Because New Jersey is the forum state, this court will look to New Jersey's choice of law provisions to determine which state's substantive law will apply to this action.

In determining which state's substantive law should govern, New Jersey courts use the "government-interest" analysis, which looks to which state has more significant connections with the transactions at issue and parties involved in the case. *See Stanton v. Rich Baker Berman & Co.*, 876 F.Supp. 1373, 1382 (D.N.J.1995). "The court determines first the governmental policies evidenced by the laws of the related jurisdiction and second the factual con-

tacts between the parties and each related jurisdiction." *McFarland v. Miller*, 14 F.3d 912, 917 (3d Cir.1994) (quotations omitted). "If a state's *contacts are not related to the policies underlying its law*, then that state does not possess an interest in having its law apply. Consequently, *the qualitative, not the quantitative nature of a state's contacts* ultimately determines whether its law should apply." *See D'Agostino v. Johnson & Johnson, Inc.*, 133 N.J. 516, 523, 628 A.2d 305 (1993) (emphasis added).

If E & Y's reference to the basis for venue in this court were the end of the analysis, then nearly every case in which venue was proper in this District would require application of New Jersey substantive law. This is neither a logical nor a necessary result.

This Court agrees with Cendant that Connecticut substantive law governs this issue. As stated, the purpose of New Jersey's Affidavit of Merit Statute is "to require plaintiffs in malpractice cases to make a threshold showing that their claim is meritorious," *In re Petition of Hall*, 147 N.J. 379, 391, 688 A.2d 81 (1997), and the failure to file an Affidavit of Merit where required is "deemed a failure to state a cause of action." N.J.S.A. § 2A:53A–29. The New Jersey Affidavit of Merit Statute conflicts with Connecticut's laws, which require a similar "certificate of good faith" for medical malpractice actions but not for accountant liability actions. *See* Conn. Gen.Stat. § 52–190a. Connecticut has a greater interest in the determination of whether an affidavit is required than does New Jersey. The Cross–Claims are asserted against an accounting firm whose accountants were licensed only in Connecticut and who performed audits only in Connecticut, for CUC and CMS. The audits were performed by Connecticut accountants based out of a Connecticut E & Y office. The audit letters were prepared, signed and issued in Connecticut for a Connecticut-based client.

That E & Y also has a New Jersey office which employs accountants, none of whom worked on the transactions at issue, and is registered to do and does business in New Jersey does not bring the claims at issue here within the purview of New Jersey's Affidavit of Merit Statute. E & Y relies upon *RTC Mortgage Trust v. Fidelity Nat'l Title Ins. Co.*, 981 F.Supp. 334 (D.N.J.1997). There the district court determined that the Affidavit of Merit statute would apply to a federal court sitting in diversity under *Erie* principles, and implied that it would have applied the statute's requirements to a defendant law firm if that firm's members had been licensed in New Jersey. *Id.* at 347–348. Because the firm's members were not licensed in New Jersey, the Court declined to apply the statute. *Id.* at 348. However, *RTC Mortgage* does not require the statute's application either in all cases involving defendant professionals who happen to be licensed or registered in New Jersey or in this case. The court in *RTC Mortgage* was not faced with a choice of law analysis, and the lawyers there were accused of having committed malpractice within the New Jersey. *Id.* Similarly, in *Martin v. Perinni*, the only question was whether the Affidavit of Merit statute applied to claims against an architectural firm that performed work in New Jersey when that work was performed by non-licensed individuals within the corporation. *See* 37 F.Supp.2d 362, 364–365 (D.N.J.1999). The district court found the statute applied under the doctrine of *respondeat superior; i.e.*, an affidavit must be provided when the negligent act committed by an unlicensed person in the course of his employment may be imputed to a licensed person. *Id.* at 365. *Martin v. Perinni* involved no choice of law issues and did not inquire into whether the statute applied when a

company's work was performed in another state by professionals licensed in that other state but the company also happened to have a New Jersey office, which did no work in the relevant transaction. *Martin v. Perinni* is irrelevant to this analysis.

Nor does the fact that the eventual harm may have occurred to HFS and to Cendant in New Jersey require the application of the statute, because such contacts are not related to the purpose of the statute, which is to ferret out frivolous lawsuits against New Jersey professionals. New Jersey has little if any interest in protection of E & Y, whose conduct occurred outside New Jersey. *See Pittston Co. v. Sedgwick James of New York, Inc.,* 971 F.Supp. 915, 924 (D.N.J.1997), *certif. granted,* 165 N.J. 129, 754 A.2d 1207 (2000) (professional malpractice action against insurance broker living and working outside of New Jersey does not implicate New Jersey's interests). Because the statute is inapplicable, this portion of E & Y's motion is denied.

## V. Breach of Contract Claims (Counts III, V and X)

E & Y moves to dismiss Counts III, V and X, the breach of contract claims. Count III alleges that E & Y breached an agreement to provide "comfort letters" that discussed the audits of the 1996 and 1997 CUC financial statements for the benefit of HFS in advance of the merger and sues on behalf of HFS as a third-party beneficiary of that agreement. Amended Cross–Cl. ¶¶ 122–127. Counts V and X allege that E & Y agreed to conduct audits of financial statements of CUC (beginning in 1983) and CMS (in 1997) in accordance with GAAS and to provide an opinion as to whether those statements complied with GAAP. ¶¶ 135–140; 163–171. E & Y takes the position that all three counts fail to state a claim because they fail to plead the required element that Cendant-presumably meaning to refer to CUC-performed its contractual duties under those agreements.[10] It also seeks dismissal of these claims because they are properly characterized as malpractice or negligence claims and not contract claims.

### A. Existence of a Cause of Action Under Contract Theory

This Court rejects E & Y's initial contention that Cendant may not plead its claims in the alternative for both negligence and breach of contract. E & Y relies primarily upon a treatise which states that the majority of states hold that "a plaintiff cannot sue a professional for breach of contract on the professional's failure to render services with due professional care." Thomas J. Shroyer, *Accountant Liability* 43 (1991). However, both Connecticut and New Jersey have recognized that a cause of action may be stated based upon a breach of duty on either a breach of contract or negligence theory, or both. *See Stevens v. Yale,* 101 Conn. 683, 693, 127 A. 283 (1925); *Dean v. Hershowitz,* 119 Conn. 398, 406, 177 A. 262 (1935) ("an action based upon the failure to use the required care and skill lies in tort and, if there is a contract, may also lie in contract."). *See also* Prosser, *Law of Torts,* p. 621 (4th ed.1971) (a complaint may state a cause of action in both contract and tort). Connecticut recognizes the existence of both causes of action in the area of professional negligence. *See Stowe v. Smith,* 184 Conn. 194, 200, 441 A.2d 81, 84 (1981)

---

**10.** E & Y observes that either New Jersey or Connecticut law will apply to the breach of contract claims, and that both states' laws require the plaintiff to plead performance of his or her own contractual duties. *See Newtown Title & Trust Co. v. Admiral Farragut*

*Acad.,* 84 F.Supp. 527, 530–31 (D.N.J.), *aff'd,* 178 F.2d 406 (3d Cir.1949); *Ravitch v. Stollman Poultry Farms, Inc.,* 165 Conn. 135, 328 A.2d 711, 719 (1973). It asserts that consequently, there is no choice of law issue. This Court agrees.

("Unless a particular conflict between the rules of contract and tort requires otherwise, a plaintiff may choose to proceed in contract, tort, or both."). E & Y attempts to distinguish that case on the basis that it held that a professional can be sued for a breach of contract only where a particular result was contracted for. E & Y Reply at 14. Nowhere does *Stowe v. Smith* so limit its own holding. Other lower court cases in Connecticut have recognized the two causes of action can coexist. *See Welty v. Criscio*, No. 426110, 2000 WL 728678 (Conn.Super. May 22, 2000) (refusing to dismiss breach of contract claim against an attorney when plaintiff simultaneously plead negligence). *Welty* cautioned that some Connecticut lower court cases that discussed professional liability in contract that could be misinterpreted to imply a requirement that parties contracted for a particular result for a breach of contract claim to exist. 2000 WL 728678, at *9. *Welty* discussed an earlier lower court decision, *Camposano v. Claiborn*, which allowed a breach of contract action because the parties had "contract[ed] for a particular result." 2 Conn.Cir.Ct. 135, 137, 196 A.2d 129 (1963). The *Welty* court found this language was

> "*potentially mischievous, since it can be misread* to imply that breach of contract claims must necessarily involve contracts promising 'a particular result.' *That of course, is simply not true. Breach of contract claims alleging failure to exercise due care in the performance of a contract are brought with some regularity*, and nothing in ... *Camposano* holds to the contrary."

*Id.*, quoting *Camposano*, 2 Conn.Cir.Ct. at 137, 196 A.2d 129 (emphasis added). *Welty* also distinguished cases that involved

single-count complaints in which the trial courts were required to determine whether the statute of limitations for contract or negligence applied. *Id.* at *8–9, discussing *Barnes v. Schlein*, 192 Conn. 732, 473 A.2d 1221 (1984); *Shuster v. Buckley*, 5 Conn. App. 473, 500 A.2d 240 (1985). Neither of those cases discussed whether a plaintiff could bring concurrent counts of contract and tort. *Welty* further distinguished two cases which stated that the plaintiff's complaint simply did not contain allegations of breach of a contractual duty. *See id.* at *8, citing *DiMaggio v. Makover*, 13 Conn. App. 321, 536 A.2d 595 (1988); *Rumbin v. Baez*, 52 Conn.App. 487, 727 A.2d 744 (1999). E & Y relies on *Rumbin* to support its contention that no claim for breach of contract lies for a professional's breach of a duty of due care when the parties did not contract for a particular result. *Welty* was especially critical of this interpretation:

> ... *Rumbin* becomes more problematic in its suggestion that a breach of contract claim must necessarily involve a "contract for a specific result." ... That proposition, if true, is a surprising one, and exceedingly difficult to reconcile with [Connecticut] Supreme Court precedent, such as *Dean v. Hershowitz* and *Stowe v. Smith*, holding that a breach of contract action can be founded on an alleged failure to exercise due care. *Rumbin*, like the Appellate Court precedent before it, cites neither *Dean* nor *Stowe* and does not consider the problem presented in this case. Consequently, *Rumbin* is best read as leaving preexisting Supreme Court precedent intact.

2000 WL 728678, at *9 (citations omitted).[11]

---

[11]. *Arnold v. Weinstein, Schwartz & Pinkus*, cited by E & Y, is also to no avail. There the court refused to grant summary judgment in an action against an accountant for breach of contract because the plaintiff had alleged the existence of a contract and its breach. 1996 WL 93602, *2–3 (Conn.Super.Ct. Feb. 13, 1996).

Similarly, New Jersey has implied it would recognize professional negligence plead as a breach of contract. *See Alan J. Cornblatt, P.A. v. Barow*, 153 N.J. 218, 708 A.2d 401 (1998) (discussing applicability of New Jersey Affidavit of Merit statute to a legal malpractice claim that was phrased in terms of breach of contract); *Levinson v. D'Aalfonso & Stein*, 320 N.J.Super. 312, 316–317, 727 A.2d 87, 89 (App.Div.1999) ("We read count one of Levinson's complaint to assert not only a claim of professional negligence of the nature contemplated by the Affidavit of Merit statute, but also a simple breach of the express terms of the retainer agreement.... [I]t is a classic contract claim against an agent, asserting damages alleged to arise because the agent breached his written contract of employment.").

The Court concludes that Cendant may plead simultaneously under Connecticut law claims for breach of contract and negligence.

### B. *Cendant's Failure to Perform Its Obligations Under the Contract*

■ E & Y submits an unsigned copy of a November 14, 1996 "engagement letter" from E & Y to CUC which it argues establishes the contract under which CUC engaged E & Y to perform GAAS audits. This letter states that management of CUC was responsible

> ... for maintaining an effective internal control structure, for properly recording transactions in the accounting records, for safeguarding assets, and for the overall fair presentation of the financial statements.... We expect management to provide us with complete, accurate, and timely information, and its failure to do so may cause us to delay our report, modify our procedures, or even terminate our engagement.

E & Y Br., Ex. B. The letter further advises that GAAS required E & Y to obtain representation letters from management as to the truthfulness of the information contained in the financial statements and that E & Y would rely upon such representations. *Id.* In support of its first argument, E & Y points out that because Cendant has alleged that senior management of CUC was involved in deliberate accounting fraud, it cannot—and does not—allege that CUC performed its own obligations under the contracts. Although Cendant makes much of the fact the letter is unsigned and may have been only a draft, it does not explicitly contest that this letter forms the basis of the contract alleged in Counts III, V or X.

Cendant disagrees that the alleged pleading failure requires dismissal: Because it has specifically plead E & Y's knowledge of CUC's misstatements, it argues that E & Y is not relieved of its obligations under the contract. Assuming the unsigned letter provided to the Court is a copy of what the parties eventually signed, E & Y explicitly promised:

> We will determine that the audit committee and appropriate members of management are informed of irregularities and illegal acts, unless they are clearly inconsequential, of which we become aware. In addition, we will inform the audit committee and appropriate members of management of significant audit adjustments and of reportable conditions.

*See* E & Y Br., Ex. B.

> An accountant may ... be engaged to perform specific agreed-upon procedures to meet a client's objectives. In fact, a client may engage an accountant to perform agreed-upon procedures specifically designed to uncover suspected theft or other illegal acts. Although not required, most accountants employ a written communication—an "engagement letter"—to specify the responsibili-

ties of both client and accountant. Thus, the nature of an accountant's duty is necessarily defined by the particular hat she is engaged to wear. Regardless of the duty undertaken, though, accountants generally must exercise the degree of professional care and skill customarily employed by reasonably competent members of their profession.

Travis Morgan Dodd, *Accounting Malpractice and Contributory Negligence: Justifying Disparate Treatment Based Upon the Auditor's Unique Role*, 80 Geo. L.R. 909, 913 (1992). Thus by entering into a contract with CUC, E & Y also impliedly promised to exercise due care under the contract.

This Court does not agree that CUC's alleged failure to provide accurate information to E & Y relieved E & Y of its responsibilities under its contract. The very duty it undertook was to exercise due care and disclose any acts of fraud it uncovered. Such a promise necessarily requires that it anticipated the possibility it would receive inaccurate financial information from CUC. Moreover, a contract to provide an independent audit necessarily includes the duty to obey all of the auditing principles and auditing standards that auditors are required to obey. In fact, one purpose of the independent audit is to protect a company and its investors from fraud. The PSLRA has imposed upon all auditors who perform audits to inform the issuer's management of any illegal activity it uncovers. 15 U.S.C. § 78j–1(b)(1)(B). If management or the audit committee does not take appropriate action, the auditor is required by law either to resign or to report the illegal activity it uncovered to the Commission. 15 U.S.C. § 78j–1(b)(3). On very similar facts, pre-PSLRA, an Illinois appellate court found that a company could assert a breach of contract claim against its independent auditor. In *Holland v. Arthur Andersen & Co.*, Arthur Andersen ("Andersen") expressly prom-

ised in its engagement letter with the plaintiff that it would conduct its audit in accordance with generally accepted auditing standards and report all irregularities that came to its attention. 127 Ill.App.3d 854, 82 Ill.Dec. 885, 469 N.E.2d 419, 428 (1984). Plaintiff alleged Andersen breached the contract by failing to disclose the inaccuracy of the company's loss reserve methodology. *Id.* The plaintiff also asserted breach by Andersen's rendering an unqualified opinion on the audited financial statement, knowing that the financial statements did not accurately reflect the company's true financial condition. *Id.* 82 Ill.Dec. 885, 469 N.E.2d at 429.

> Considering that the instant action is only at the pleading stages, it can reasonably be inferred from [plaintiff's] allegations that Andersen became aware of irregularities with respect to ... [plaintiff's] loss reserve methodology ... and that Andersen failed to disclose those irregularities ... when it issued its unqualified opinion.

*Id.* The Court held these allegations were sufficient to state a breach of contract. *Id.* Here E & Y is in the same position as Andersen in *Holland.* The purpose of the audit was to certify that the financial statements comported with GAAP; Cendant alleges that E & Y was provided incorrect information and knew of the irregularities. Moreover, even if certain individuals at CUC knew the financial information was inaccurate, other CUC management are not alleged to have known of the financial misstatements. (*See* Amended Cross–Cl., ¶ 29.) Cendant has alleged sufficient facts to plead a breach of contract.

Furthermore, HFS and Cendant were both intended third-party beneficiaries of the contracts between CUC and E & Y. Neither HFS nor Cendant had any obligations under the contract; as third-party beneficiaries, they are entitled to bring an

action against any party whose failure to perform under the contract caused them damages. CUC, on the other hand, may have contributed to its own damages under the contract. The Court is cognizant that E & Y may ultimately prevail if Cendant does not prove that E & Y knew of the irregularities. Whether that is so is a question for trial.

### VI. *Breach of Fiduciary Duty Claims (Counts VII and XII)*

In Count VII, Cendant asserts breach of fiduciary duty to it, and cites E & Y's lack of due care in its conduct of audits of CMS's 1997 financial statements and its failure to bring irregularities to the attention of management, the audit committee or the board of directors. Cendant also claims that E & Y personnel knowingly made false misrepresentations to the Audit Committee that E & Y could give an unqualified opinion for CMS' financial statements for 1997; made false representations to the Audit Committee Investigation interviewers "in an effort to conceal the fraud and E & Y's involvement in it"; (¶ 95) and knowingly made false representations to Cendant management concerning the Ideon reserve at a meeting at CMS headquarters on March 9, 1998, upon which Cendant relied when it filed its annual Form 10–K with the SEC on March 31, 1998. *See* ¶ 91.

In Count XII, Cendant asserts breach of fiduciary duty as successor to CUC. It alleges that E & Y owed CUC a fiduciary duty "in connection with the auditing and review services it rendered with regard to the consolidated financial statements of CUC prior to the Merger." (¶ 179). Cendant further alleges that E & Y breached this duty by lack of due care in performance of the audits and reviews, failure to discover irregularities and failure to disclose such accounting irregularities to management, the audit committee or the board of directors at CUC. (¶ 180).

E & Y moves to dismiss these two counts because Cendant has not alleged facts to support the existence of a fiduciary relationship between the parties. It avers that neither the New Jersey nor the Connecticut Supreme Court has ruled on whether an independent auditor has a fiduciary relationship with its client, but advances numerous cases which purport to establish a national trend that an auditor is not a fiduciary. *See, e.g., Franklin Supply Co. v. Tolman,* 454 F.2d 1059, 1065 (9th Cir.1971); *Mishkin v. Peat, Marwick Mitchell & Co.,* 744 F.Supp. 531, 532 (S.D.N.Y.1990); *Painters of Phila. Dist. Council No. 21 Welfare Fund v. Price Waterhouse,* 879 F.2d 1146, 1151 (3d Cir. 1989); *RTC v. KPMG Peat Marwick,* 844 F.Supp. 431, 436 (N.D.Ill.1994). E & Y insists that the very nature of the independent auditor is that it be independent of its client and not "duty-bound to protect the best interests of its client." E & Y Br. at 30.

Cendant responds that the issue of whether a fiduciary relationship exists is a question of fact that should be resolved for the trier of fact. *See Facchini v. Miller,* No. CV 175580, 2000 WL 175580, *4 (Conn.Super.Jan.31, 2000) ("The function of a motion to strike ... is to determine whether a cause of action has been stated by the facts pleaded ... The issue is not whether the facts prove a fiduciary relationship but whether the plaintiff has alleged facts which, if proved, would support the finding that one existed.") (citation omitted); *Gengras v. Coopers & Lybrand,* No. CV–92 0517836S, 1994 WL 133424 (Conn.Super. March 31, 1994) (refusing to dismiss claim of breach of fiduciary duty against accounting firm, finding this to be more properly an issue of fact for trial than for a motion to strike). This Court must determine whether plaintiffs could prove any set of facts based upon the allegations contained in the Complaint that

would establish the existence of a fiduciary relationship.

E & Y is correct that the client-accountant relationship is generally not a fiduciary relationship when the accountant is employed to audit financial statements, because the independence required is "fundamentally inconsistent with status as a fiduciary." M. Thomas Arnold, *Breach of Fiduciary Duty,* 506 PLI/Lit. 341, at 349–350. Accountants' Liability (1994). However, when the auditor's relationship goes beyond merely rendering an independent audit and providing investment advice, such a relationship may exist. *Id.* "[A] fiduciary relationship exists where a client justifiably reposes trust and confidence in an accountant to act in the client's interest. Such a relationship may exist where the accountant renders personal financial, investment or tax advice to a client or where the accountant manages the assets or business of a client." *Id.,* at 349–350.

 Under both New Jersey and Connecticut law, a fiduciary relationship exists when one person is "under a duty to act for or *give advice for the benefit of another* on matters within the scope of their relationship." *F.G. v. MacDonell,* 150 N.J. 550, 563, 696 A.2d 697, 704 (1997), citing Restatement (Second) of Torts, 874 cmt. a (1979). *See also Albom v. Katz Corp.,* 39 Conn.Supp. 533, 535–36, 466 A.2d 1206, 1208 (App.1983) (a fiduciary is " 'a person holding the character of a trustee, or a character analogous to that of a trustee, in respect to the trust and confidence involved in it and the scrupulous good faith and candor it requires. A person having duty, created by his undertaking, *to act primarily for another's benefit* in matters connected with such undertaking.' "), quoting *Black's Law Dictionary.*

Notwithstanding E & Y's reference to law in other jurisdictions, neither Connecticut nor New Jersey has ruled that an accounting firm may not have a fiduciary relationship with its clients.[12] To the contrary, in *Gengras v. Coopers & Lybrand,* the trial court explicitly refused to dismiss a claim against an auditor for failure to disclose the suspicious and irregular activities of the audited client's partners. 1994 WL 133424, at *4. That court found that such facts could fall within the Connecticut Supreme Court's "concept of a fiduciary duty as being a situation in which there is 'justifiable trust confided on one side and a resulting superiority and influence on the other.' " *Id. Gengras* further observed that the Connecticut Supreme Court has "specifically refused to define 'a fiduciary relationship in precise detail and in such a manner as to exclude new situations.' " *Id.* at *3, quoting *Alaimo v. Royer,* 188 Conn. 36, 41, 448 A.2d 207 (1982). In *Facchini v. Miller,* the court struck a plaintiff's claim against an accountant who had performed accounting services for a client with whom plaintiff had contracted and upon whose financial records the plaintiff had relied. 2000 WL 175580, at *4. However, the reason given was that the plaintiff had "failed to allege that he had some special relationship [or] that he was a client of the defendants but merely alleged reliance on financial information generated for [the accountant's client.]" *Id.* This decision implicitly recognized an accountant's client or someone who has a special relationship with the accountant may be considered to be in a fiduciary relationship with the accountant under Connecticut law. Nor has the Court located any New Jersey case that would preclude an outside

---

12. *Painters of Philadelphia,* cited by E & Y, states only that an independent public accounting firm that does no more than perform an audit for an ERISA plan is not a fiduciary of the plan under ERISA. 879 F.2d at 1151.

auditor from falling within the definition of a fiduciary so long as that accountant was "under a duty to act for or give advice for the benefit of" the client. *F.G. v. MacDonell,* 150 N.J. at 563, 696 A.2d 697.

Cendant alleges that CUC was E & Y's client; CUC relied upon E & Y's advice, particularly the comfort letters; E & Y failed to perform according to the appropriate professional standard of care; and that Cendant has experienced damages as a result. It is clear that E & Y's work went beyond merely provision of independent audits but also provided advice upon which it knew Cendant would rely in making important decisions. These allegations are sufficient for Cendant to be able to demonstrate it reposed trust in E & Y's superior skill and knowledge, specifically for the benefit of Cendant. Such facts, if proved, would be sufficient to establish a fiduciary relationship with E & Y. Because Cendant has sufficiently plead facts that, if proved, would establish the existence of a fiduciary relationship, the motion is denied.

## CONCLUSION

E & Y's motion to dismiss Count VIII is granted; its motion to dismiss the remaining Counts is denied.

**SO ORDERED.**